1   JOSEPH P. RUSSONIELLO (CABN 44332)
    United States Attorney

2

3   BRIAN J. STRETCH (CABN 163973)
    Chief, Criminal Division

4   SUSAN R. JERICH (CABN 188462)
    Assistant United States Attorney

5

6       450 Golden Gate Avenue
        San Francisco, CA 94102
        Telephone: (415) 436-7158
7       Fax: (415) 436-7234
        E-Mail: Susan.Jerich@usdoj.gov

8

    Attorneys for Plaintiff

9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                    SAN JOSE DIVISION

13

14   UNITED STATES OF AMERICA,          )    No. CR 07-289 RMW
                                        )
15            Plaintiff,                )    GOVERNMENT'S OPPOSITION TO
                                        )    DEFENDANT KIM MAI'S MOTION TO
16        v.                            )    SUPPRESS WIRETAP EVIDENCE AND
                                        )    FOR HEARING REGARDING
17   KIM MAI,                           )    NECESSITY
                                        )
18            Defendant.                )    Date:   September 2, 2008
     _____  )    Time:  9:00 a.m.
19                                           Court:  Hon. Ronald M. Whyte

20                        **INTRODUCTION**

21        The defendant's motion to suppress evidence derived from a September 5, 2006 wiretap

22   order for failure to demonstrate necessity pursuant to 18 U.S.C. §2518(3)(c) should be denied.

23   First, the defendant has failed to demonstrate that she has standing to challenge the wiretap order.

24   Second, contrary to defendant's argument, the wiretap affidavit does contain the requisite

25   showing of necessity required by 18 U.S.C. §2518(3)(c) and is not merely "generic" or composed

26   of "boilerplate" language.  Finally, the authority relied upon by the defendant, United States v.

27   Blackmon, 273 F.3d 1204, 1210-11 (9th Cir. 2001) is inapposite to the case at bar as Blackmon is

28   limited to situations involving both boilerplate language and Franks violations.  That is not our

GOVT'S OPP. TO DEF. KIM MAI'S MOTION TO SUPPRESS WIRETAP EVIDENCE AND FOR
HEARING REGARDING NECESSITY          1

1   case. Accordingly, the defendant's motion should be denied.

2   ## BACKGROUND

3   On September 5, 2006, the Honorable Jeremy Fogel, United States District Court, Northern

4   District of California, issued an order authorizing the interception of conversations occurring

5   over a telephone, identified as Target Telephone 1, used by Nam Nguyen, for a 30-day period.

6   The order was based upon an affidavit sworn to by Special Agent (SA) Sammy A. Parks of the

7   Drug Enforcement Administration (DEA) also on September 5, 2006. *See* Affidavit of DEA

8   Special Agent Sammy A. Parks (hereinafter Parks Affidavit), attached here as Exhibit A.

9   In the Parks affidavit, SA Parks informed the court that a federal district court judge sitting in

10  the Southern District of California had authorized the interception of conversations occurring over

11  a telephone used by Linh Nguyen, a suspected marijuana and ecstasy trafficker in the San Diego,

12  California area. Parks Aff. ¶ 43. The Linh Nguyen interceptions took place from approximately

13  April 25, 2006 through May 24, 2006. *Id.* During the Linh Nguyen interceptions, conversations

14  between Linh Nguyen and Target Telephone 1, subscribed to by Nam Nguyen, were intercepted. *Id.*

15  Those calls indicated that Nam Nguyen supplied Linh Nguyen with ecstasy. Parks Aff. ¶ 44.

16  Additionally, Nam Nguyen and Linh Nguyen discussed the quality and price of marijuana. *Id.*

17  In addition, the Affidavit states that SA Parks confirmed Nam Nguyen as the user of Target

18  Telephone 1 by placing a ruse call on May 26, 2006. Parks Aff. ¶ 45.

19  From approximately May 20, 2006 through August 16, 2006, agents used pen register analysis

20  to determine that Target Telephone 1 was in contact with a variety of telephone numbers believed

21  to be associated with known drug traffickers including, but not limited to, Linh Nguyen. Parks Aff.

22  ¶¶ 46-52. Several of these same telephone numbers which were in contact with Target Telephone

23  1 were numbers associated with San Diego wire interception investigations. Additionally, agents

24  pursued a number of other traditional techniques in an effort to identify the members of Nam

25  Nguyen's organization – including his suppliers, customers and assistants – and to obtain proof

26  beyond a reasonable doubt of each person's involvement in the conspiracy, as well as to identify the

27  full extend and scope of the conspiracy's drug dealing and money laundering activities. Parks Aff.

28  ¶¶ 58-111. Agents engaged in extensive surveillance of Nam Nguyen including at his residence and

1  other locations. Parks Aff. ¶¶71-78. They searched Nam Nguyen's trash, established a pen register

2  on his telephone, examined his telephone toll records and established a mail cover at his home

3  address.

4      The DEA agents also attempted to gather additional information on Nguyen by identifying

5  possible confidential sources's who may have knowledge of or be able to infiltrate the Nguyen's

6  drug trafficking organization (DTO). Parks Aff. ¶ ¶58-59. However, agents were unable to identify

7  any relevant confidential sources. *Id.* In spite of the extensive efforts undertaken by San Jose DEA

8  from approximately May 20, 2006 through August 16, 2006, agents were unable to identify, using

9  traditional investigative means, all those involved in the ecstasy and marijuana trafficking

10 conspiracy, including buyers and suppliers. Parks Aff. ¶58. The investigation was unable to identify

11 the location(s) where the ecstasy and marijuana was being transported and stored; locations where

12 money and other assets acquired from the drug trafficking may have been located and, it had failed

13 to develop sufficient evidence to prosecute those who continued to carry out the activities of the drug

14 trafficking conspiracy. *Id.*

15     At this point, when the agents were unable to achieve the goals of their investigation after four

16 months of traditional investigative means, SA Parks applied to Judge Fogel for authorization to

17 intercept wire communications occurring over a telephone subscribed to by Nam Nguyen. That

18 authorization was granted on September 5, 2006. Interception of Target Telephone 1 began on or

19 about September 5, 2006, and ended on or about October 5, 2006.

20     During the course of the September 5 wiretap, agents intercepted numerous conversations

21 between Nam Nguyen and other individuals discussing ecstasy trafficking. For example, agents

22 intercepted numerous calls between Nam Nguyen and Huy Ngo, an as of yet unidentified co-

23 conspirator, wherein they discussed supplying ecstasy to Linh Nguyen and a variety of other

24 customers. As well, agents intercepted a September 23, 2006 phone call (the subject of defendant's

25 instant motion) between Mai and Nam Nguyen in which Mai tells Nam Nguyen that she has a third

26 party interested in buying ecstasy. These pertinent calls, in turn, provided agents with probable cause

27 to obtain a federal search warrant for the residence in which defendant Mai and Nam Nguyen reside.

28 A search of Nam Nguyen's bedroom turned up approximately 2,000 ecstasy tablets. No arrests were

1    made at that time.  Agents did, however, continue to monitor Nam Nguyen's telephone.

2                                        **ARGUMENT**

3    I.   THE DEFENDANT LACKS STANDING TO SEEK SUPPRESSION OF THE SEPTEMBER
         23, 2006 PHONE CALL BECAUSE SHE HAS FAILED TO SUBMIT THE REQUISITE
4        DECLARATION IDENTIFYING HERSELF AS A PARTICIPANT IN THE CHALLENGED
         PHONE CALL
5
6        Defendant Mai seeks to suppress the content of a September 23, 2006 telephone conversation

7    intercepted pursuant to a wiretap order for a cellular telephone subscribed to and used by Nam

8    Nguyen (Target Telephone 1).  While the defendant lacks standing to seek the suppression of any

9    phone call to which she was not a party, she may seek suppression of an intercepted conversation

10   to which she was a party. However, because the defendant has not filed an appropriate declaration

11   stating that she was one of the individuals whose voice was intercepted in the September 23

12   conversation which was the subject of the wiretap order, she currently lacks standing to seek

13   suppression of the subject telephone conversation.

14        It is well settled that a defendant seeking to challenge the legality of a wiretap must satisfy

15   the standing requirement applicable to Fourth Amendment suppression claims.  The defendant must

16   allege that he had a "legitimate expectation of privacy" that was violated by the wiretap.  United

17   States v. Ruggiero, 928 F.2d 1289, 1303 (2nd Cir.), cert. denied, 502 U.S. 938 (1991).  Under Title

18   18, United States Code, Section 2518(10), electronic surveillance may be challenged only by an

19   "aggrieved person."  18 U.S.C. § 2510(11) defines an "aggrieved person" as "a person who was a

20   party to any intercepted wire, oral, or electronic communication or a person against whom the

21   interception was directed." As the Supreme Court explained in Alderman v. United States, 394 U.S.

22   165, 176-178, 89 S.Ct. 961 (1969), "[t]he established principle is that suppression of the product of

23   a Fourth Amendment violation can be successfully urged only by those whose rights were violated

24   by the search itself, not by those who are aggrieved solely by the introduction of damaging

25   evidence."  The Supreme Court has interpreted this rule as allowing a defendant to seek suppression

26   only if he was a participant in an intercepted conversation or if such conversation occurred on his

27   premises.  Alderman v. United States, supra., 394 U.S. at 176, 89 S.Ct at 968.

28        Here, defendant Mai has failed to submit a declaration stating that she was one of the

individuals whose voice was intercepted in the September 23, 2006 phone conversation that was the subject of the wiretap order. Northern District of California Criminal Local Rule 47-2(b) provides that motions presenting issues of fact "shall be supported by affidavits or declarations which shall comply with the requirements of Civil L.R. 7-5." Civil Local Rule 7-5(b) states that "(a)n affidavit or declaration shall contain only facts (and) shall conform as much as possible to the requirements of F.R.CivP. 56(e)..." Federal Rule of Civil Procedure 56(e), in turn, states, in part:

> ...(A)ffidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein...

In short, these rules require that declarations be filed in support of criminal pretrial motions involving disputed factual issues and that such declarations must be made on the basis of personal knowledge and set forth admissible material facts with particularity. In United States v. Wardlow, 951 F.2d 1115, 1116 (9th Cir. 1991), cert. denied, 506 U.S. 976 (1992), the Ninth Circuit upheld the denial of a defendant's request for an evidentiary hearing in a suppression motion where the defendant failed to submit a personal declaration - rather than a broad declaration of his counsel - which comported with a similar local rule in the Central District of California. Id.

In this case, it is undisputed that defendant Mai was not "a person against whom the interception was directed" within the meaning of 18 U.S.C. §2510(11) with regards to the wiretap interception order that was signed on September 5, 2006 regarding the cell phone subscribed to by Nam Nguyen (Target Telephone 1). Therefore, the defendant only has standing to seek suppression of the telephone conversation(s) intercepted pursuant to the wiretap order directed against Nam Nguyen if she personally signs and files an appropriate declaration in support of the motion identifying which conversation(s) she claims to have personally participated in as a speaker. In the event she fails to do so, the court should deny the defendant's motion regarding the conversation(s) intercepted pursuant to the wiretap order on that basis alone. In the alternative, assuming the defendant subsequently does file the appropriate declaration, the government addresses infra the merits of defendant's motion.

// //

// //

1

## II. THE WIRETAP AFFIDAVIT FOR TARGET TELEPHONE 1 CONTAINED THE REQUISITE SHOWING OF NECESSITY TO SUPPORT A WIRETAP ORDER

2

3

A.  The issuing judge's finding of necessity for the wiretap order for Target Telephone 1 is entitled to great deference and may only be overturned for abuse of discretion

4      A judge may properly authorize a federal wiretap when he determines on the basis of the facts

5   submitted by the applicant that, inter alia, "normal investigative procedures have been tried and have

6   failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  Title 18,

7   United States Code, Section 2518(3)(C).  Courts are required to interpret the necessity requirement

8   in a practical and common sense fashion.  United States v. Smith, 893 F.2d 1573, 1582 (9th Cir.

9   1990), United States v. Commito, 918 F.2d 95, 98 (9th Cir. 1990), cert. denied, 112 S. Ct. 224 (1991),

10  and United States v. Brown, 761 F.2d 1272, 1275 (9th Cir. 1985).  The issuing judge's finding of

11  necessity may be overturned only for abuse of discretion.  United States v. Bennett, 219 F.3d 1117,

12  1121 (9th Cir. 2000) ("[w]e review for abuse of discretion an issuing judge's decision that a wiretap

13  was necessary"), Commito, 918 F.2d at 98, United States v. Homick, 964 F.2d 899, 903 (9th Cir.

14  1992), Brown, 761 F.2d at 1275, and United States v. Torres, 908 F.2d 1417, 1422 (9th Cir. 1990),

15  cert. denied, 498 U.S. 948 (1990).

16     Moreover, the district judge who authorizes a wiretap has considerable discretion to determine

17  whether an adequate showing of probable cause and necessity has been made, and a court reviewing

18  the issuing judge's conclusions regarding probable cause and necessity must give great deference

19  to the issuing judge.  United States v. Brone, 792 F.2d 1504, 1506 (9th Cir. 1986),  United States v.

20  Martin, 599 F.2d 880, 887 (9th Cir.), cert. denied, 441 U.S. 962 (1979), and Brown, 761 F.2d at 1275.

21     The necessity requirement in the wiretap statute was designed to ensure that wiretaps are not

22  routinely employed as the initial step in criminal investigations.  United States v. Giordano, 416 U.S.

23  505, 515 (1974).  By the same token, law enforcement officials need not exhaust every conceivable

24  investigative technique before obtaining a wiretap.  See Commito, 918 F.2d at 98-99 ("the existence

25  of a potentially productive unused method [of investigation] is not fatal in this necessity

26  determination ...."), United States v. Carneiro, 861 F.2d 1171, 1178 (9th Cir. 1988) ("[t]he fact that

27  the DEA could have taken different or additional steps in its investigation does not demonstrate that

28  the district court abused its discretion in upholding the wiretap order"), and United States v.

1   Spagnuolo, 549 F.2d 705, 710 (9th Cir. 1977), cert. denied, 445 U.S. 934 (1980) (affidavit was not

2   insufficient because it did not prove beyond a shadow of a doubt that ordinary techniques have been

3   completely unsuccessful, or would fail, or that their use would result in a loss of life or some

4   equivalent disaster; they need only to have reached a stage where further use cannot reasonably be

5   required).

6       Necessity for a wiretap is evaluated in light of the government's need not merely to collect some

7   evidence, but to develop an "effective case" against those involved in the conspiracy; an "effective

8   case" is defined as evidence of guilt beyond a reasonable doubt.  United States v. Decoud, 456 F.3d

9   996, 1007 (9th Cir. 2006).

10      Although a wiretap should not be used routinely as a first step in criminal investigations, the case

11  law is clear that it need not be the last resort.  Smith, 893 F.2d at 1598, United States v. Baker, 589

12  F.2d 1008, 1013 (9th Cir. 1979).  Thus, the "necessity requirement means that the affidavit must set

13  out a factual background that shows that ordinary investigative procedures, employed in good faith,

14  would likely be ineffective in the particular case," Brone, 792 F.2d at 1506, or that "normal

15  investigative techniques employing a normal amount of resources have failed to make the case

16  within a reasonable period of time."  United States v. Bailey, 607 F.2d 237, 242 (9th Cir. 1979), cert.

17  denied, 445 U.S. 934 (1980).  The government is not required doggedly to continue an unproductive

18  investigation.  Commito, 918 F.2d at 98.  As the Ninth Circuit observed in Baker:

19      Government investigators, subject to evaluation by the courts on similar bases, are entitled to use
        reason and common sense in the performance and documentation of their investigations to
20      support applications for wiretaps.  The statute does not mandate the indiscriminate pursuit to the
        bitter end of every non-electronic device as to every telephone and principal in question to the
21      point where the investigation becomes redundant or impractical or the subjects may be alerted
        and the entire investigation aborted by unreasonable insistence upon forlorn hope.  Baker, 589
22      F.2d at 1013.

23      In evaluating the sufficiency of wiretap affidavits, courts have adopted a practical common sense

24  approach.  Bailey, 607 F.2d at 241, Bennett, 219 F.2d at 1122.  It is sufficient if "the affidavit read

25  as a whole established the futility of using normal investigative procedures."  United States v. Kail,

26  612 F.2d 443, 447 (9th Cir. 1980).  "[A] particularized showing ... may be established ... not only

27  by a minutia of detail discretely directed, but by persuasive facts pertaining in common to all of the

28

1   principals and their telephones." Baker, 589 F.2d at 1012.

2       Although mere conclusions, without any factual basis, are insufficient to support a wiretap order,

3   an affidavit which describes the peculiarities of the particular illicit organization which necessitates

4   the wiretap and details the unsuccessful investigatory efforts undertaken will be deemed to be

5   sufficient. Id., United States v. Kalustian, 529 F.2d 585, 590 (9th Cir. 1976). Moreover, the presence

6   of conclusory language in the affidavit will not negate a finding of necessity if the affidavit, as a

7   whole, alleges sufficient facts demonstrating necessity. Torres, 908 F.2d at 1423 (9th Cir. 1990),

8   United States v. Fernandez, 388 F.3d 1199, 1237 (9th Cir. 2004) (wiretap affidavit contained

9   sufficient showing of necessity despite boilerplate assertions regarding the inherently limited nature

10  of pen registers, trap and trace devices, and trash search techniques), Carneiro, 861 F.2d at 1177

11  ( affidavit met necessity requirement even though it included conclusory statements about difficulties

12  in recruiting informants), and Brone, 792 F.2d at 1506 (affidavit met necessity requirement even

13  though it included conclusory and unsupported statements about the difficulties of prosecuting this

14  particular case.)

15      Further, courts will not invalidate a wiretap order because defense lawyers are able to suggest

16  after the fact some investigative technique that might have been used but was not. Carneiro, 861

17  F.2d at 1179, United States v. Webster, 734 F.2d 1048, 1055 (5th Cir. 1984.) The necessity

18  requirement can be satisfied even though the agents failed to use a normal investigative technique,

19  such as use of confidential informants. Carneiro, 861 F.2d at 1178, United States v. Pezzino, 535

20  F.2d 483, 484 (9th Cir. 1976).

21      Investigations of criminal conspiracies present unique law enforcement problems and pose a

22  greater threat to society than individual action toward the same end. United States v. McGuire, 307

23  F.3d 1192, 1197 (9th Cir. 2002). Accordingly, any previous success from the use of confidential

24  informants is even less persuasive in the context of an investigation of a criminal conspiracy. Id. at

25  1198, United States v. Canales-Gomez, 358 F.3d 1221, 1226 (9th Cir. 2004). In analyzing the

26  requisite necessity for a wiretap order, the government is entitled to more leeway in its investigative

27  methods when it pursues a conspiracy. Id.

28      Finally, it is well established that when normal investigative procedures have been successful

GOVT'S OPP. TO DEF. KIM MAI'S MOTION TO SUPPRESS WIRETAP EVIDENCE AND FOR
HEARING REGARDING NECESSITY                8

in developing evidence against only some of the key members of the targeted narcotics conspiracy, necessity for a wiretap still exists where the objective of the investigation is to discover the full scope of the drug enterprise. United States v. Echavarria-Olarte, 904 F.2d 1391, 1396 (9th Cir. 1990), Bailey, 607 F.2d at 242, United States v. Sandoval, 550 F.2d 427, 430 (9th Cir. 1976), cert. denied, 434 U.S. 879 (1977), Commito, 918 F.2d at 98, and United States v. Martinez, 588 F.2d 1227, 1232 (9th Cir. 1978). As the Ninth Circuit stated in Torres:

> We have consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of suppliers, major buyers, or other satellite conspirators. Torres, 908 F.2d at 1422.

B. The September 5, 2006 Wiretap Affidavit contained a full and complete statement of investigative techniques which had been tried and failed, were unlikely to succeed, or were too dangerous to attempt, in compliance with 18 U.S.C. §§ 2518(1)(c) and 2518(3)(c)

The defendant appears to raise two challenges to Judge Fogel's finding of necessity. First, she claims that the affidavit in support of the wiretap order is "generic" and "non-specific", which are different ways to suggest that the affidavit is "boilerplate". (Def. Mot. , p. 16: 12-14). Second, she argues that certain traditional investigative techniques were either not pursued by law enforcement or that law enforcement failed to exhaust these investigative techniques. Id. Accordingly, she argues, the wiretap order is devoid of the requisite showing of necessity and must be suppressed. In support of her position, the defendant relies upon United States v. Blackmon, 273 F.3d 1204, 1210-11 (9th Cir. 2001). However, Blackmon is limited to situations involving both boilerplate and Franks violations. That is not our case.

1. The case law relied on by the defendant is inapposite

In Blackmon, the necessity section of a spin-off wiretap affidavit simply recycled the identical information used in an original affidavit with the minor addition of pen register information. The spin-off affidavit falsely stated that surveillance teams were compromised on several occasions in an effort to conduct surveillance on the defendant. The affidavit also falsely stated that the FBI's cooperating sources possessed only limited knowledge concerning the scope of the targeted organization when, in fact, the cooperating informants available to the government had grown up in the housing project where the organization was based, had known

1    the defendant for over ten years, and had actually seen him cooking cocaine in his apartment.

2    The Ninth Circuit excised the material misstatements and omissions from the spin-off wiretap

3    affidavit and held that it lacked the requisite necessity to justify a wiretap order.  The Court's

4    holding in <u>Blackmon</u> "was premised on a finding that the affidavits supporting the wiretap

5    applications were plagued by material misrepresentations and omissions." <u>Fernandez</u>, <u>supra.</u>,

6    388 F.3d at 1237.  <u>Blackmon</u>'s rule is simply inapposite.  <u>See</u> <u>United States v. Abascal</u>, 564 F.2d

7    821, 826 (9ᵗʰ Cir. 1977) (rejecting claim that wiretap affidavit contained mere "boilerplate"

8    where "the affidavit etched the nature and contours of this conspiracy and the nature and extent

9    of this investigation up to the requesting point with enough particularity to allow a judge

10   reasonably to ascertain that continued use of ordinary surveillance probably would be fruitless").

11       In this case, there were no such material misstatements or omissions in the wiretap affidavit

12   and the government certainly did not have an informant or undercover agent available who was

13   familiar with, or could be expected to become familiar with, the defendant.

14       2. <u>Investigative Techniques Employed Prior to Seeking Authorization for a Wiretap</u>

15       Here, the affidavit of DEA Special Agent Parks in support of the wiretap application for the

16   defendant's cell phone dedicated twenty (20) pages to explaining the reasons why various

17   traditional law enforcement techniques would not have been reasonably likely to succeed in

18   allowing the government to achieve the goals of its investigation (see pages 38-58 of the

19   September 2006 wiretap affidavit.)[1]  The fact that some of the language used in the affidavit may

20   ─────────────────────

21       [1]      The Investigative Goals as set forth on page 5 of the September 5, 2006 affidavit
         were as follows:
22          a.  Identify the manner, scope and extent that the Target Telephone is being used to
23   facilitate the above offenses, which supports the existence of a conspiracy and which provides
         evidence of the identities and roles of the Target Subject, co-conspirators, and the precise nature
24   and scope of their illegal activities.
            b.  To identify all of the members of this organization (in Santa Clara county and
25   elsewhere) who are involved in the importation and distribution of MDMA and marijuana, their
         roles in the criminal conspiracy, their methods of operation and all sources of supply.
26
            c.  To identify the distribution networks used by this organization and all of the co-
27   conspirators, the methods by which they transport and ship MDMA, and the identities of all
         criminal participants - including buyers - from the first point of importation to the sale and
28   delivery to street users.  This would include the dates, times, places, schemes, and methods used

GOVT'S OPP. TO DEF. KIM MAI'S MOTION TO SUPPRESS WIRETAP EVIDENCE AND FOR
HEARING REGARDING NECESSITY                   10

1   have been generalized or so-called "boilerplate" does not detract from its relevance and Ninth

2   Circuit precedent permits its use.  United States v. Fernandez, 388 F. 3d 1199, 1237 (9th Cir.

3   2004).  Moreover, contrary to the defendant's assertion, the affidavit was case-specific in its

4   explanation as to why the various investigative methods would not have been likely to succeed or

5   did not succeed in meeting the investigative goals.  Further still, the court is required to consider

6   the entire affidavit in assessing whether it set forth the requisite necessity for a wiretap order, not

7   merely the facts which may have been specifically mentioned in the "Need for Interception of

8   Wire Communications" section of the affidavit.  The September 5, 2006 affidavit incorporated by

9   reference four prior wiretap affidavits submitted on November 28, 2005, January 10, 2006,

10  February 10, 2006 and March 23, 2006 to the district court in San Diego, California. In analyzing

---

by the Target Subject and co-conspirators for manufacturing, selling, buying, possessing, concealing, transporting and distributing ecstasy and marijuana.

     d. To identify the financial dealings of the organization members and all of their co-conspirators and to locate the destination of monetary proceeds from the sales of narcotics, including bank accounts or other investments; to identify the methods by which the illicit proceeds are transported from the distribution areas to their final destination; and to identify properties and items of value belonging to the members of the organization and co-conspirators that were purchased with illicit proceeds of their narcotics sales.

     e. To identify the location of stash houses and sites used by the Target Subject and associates and co-conspirators to manufacture ecstasy and other controlled substances.

     f. To identify the location of financiers, managers and supervisors of the ecstasy manufacturing and distribution organization.

     g. To identify the location and existence of books and records, computer disks, ledgers, telephone address books, telephone answering devices, photographs, videotapes, cassette tapes and all documents related to these narcotics offenses.

     h. To identify the locations and means that are being used by the organization and the co-conspirators to facilitate the distribution of MDMA.

     i. To identify the dates, times, and places of MDMA deliveries, the quantities of drugs requested, and the amount being paid for these items.

     j. To identify the location of assets which may be subject to seizure or forfeiture accumulated by the Target Subject and co-conspirators.

     k. To identify communications facilities including residential telephones, business telephones, pay telephones, fax machines, computer communications systems, voice mail systems, digital players and/or cellular telephones commonly used by the Target Subject and associates and co-conspirators.

     l. To develop proof beyond a reasonable doubt of the intent of each participant to join this conspiracy and to participate willingly.

GOVT'S OPP. TO DEF. KIM MAI'S MOTION TO SUPPRESS WIRETAP EVIDENCE AND FOR
HEARING REGARDING NECESSITY                    11

1  the necessity issue in this case, therefore, the court is required to consider the contents of four

2  prior lengthy and detailed wiretap affidavits, as well as what is set forth in the Parks affidavit.

3      The following law enforcement techniques were discussed in the Parks affidavit:

4      a. Confidential Informants (pages 38-40, Parks affidavit):

5      Here, while agents did try to identify confidential sources to assist in the Nam Nguyen DTO

6  investigation, they were ultimately unable to do so.  Parks states in his affidavit that while they

7  were aware that San Diego used confidential sources in their investigation, DEA San Jose did not

8  believe these same confidential sources would be of value to the Nam Nguyen DTO

9  investigation.  Further, DEA San Jose's efforts to identify any additional confidential sources

10  with information regarding the San Jose-based Nam Nguyen DTO also proved fruitless. Parks

11  Aff. ¶¶58-59.

12      The defendant claims that agents could have done more to develop confidential sources in

13  their investigation of the Nam Nguyen DTO.  For example, she suggests that agents should have

14  considered the two San Diego informants "who might have been utilized to make buys from Nam

15  or get close to him or introduce him to a local cooperating witness."  Def. Mot. 7:5-7.

16  Additionally, the defendant argues that DEA could have "stepped up their surveillance on

17  Nguyen to try to discover if he were selling ecstasy locally, could have arrested a buyer away

18  from Nam's house or business and put pressure on that buyer to become an informant."  Def.

19  Mot. 7:12-14.  Common sense suggests against these arguments and no relevant authority

20  supports them.  The defendant provides no additional authority to buttress this or any of her

21  arguments. As stated supra, defendant's reliance on Blackmon is misplaced.  The defendant does

22  not claim any misrepresentation or omission here; she simply disagrees with the district court's

23  conclusion.

24      DEA San Jose properly discounted both San Diego CSs as an option. It is unrealistic for the

25  defendant to argue that a confidential source in San Diego, California (CS1), with no connection

26  to the Nam Nguyen DTO, San Jose, California, could infiltrate or "get close" to Nam Nguyen.

27  Moreover, the notion that the other San Diego confidential source, David Bailey, who was

28  informing on Linh Nguyen while also dealing in ecstasy (although he advised law enforcement

1   that he was not involved in narcotics trafficking) would prove a fruitful or reliable entree into the

2   Nam Nguyen DTO.  And, even if either of these techniques suggested by the defendant may have

3   proved somewhat useful, it is worth underscoring here that the government "need not exhaust

4   every conceivable alternative before obtaining a wiretap." Canales Gomez, 358 F.3d at 1225-26.

5       Moreover, courts will not invalidate a wiretap order because defense lawyers are able to

6   suggest after the fact some investigative technique that might have been used but was not.

7   Carneiro, 861 F.2d at 1179.  The necessity requirement can be satisfied even though the agents

8   failed to use a normal investigative technique such as the use of confidential informants.

9   Carneiro, 861 F.2d at 1178.  For example, defendant's additional suggestion that agents could

10  have stopped Jimmy Nguyen on a pretext, "found him to be in possession of controlled

11  substances" and developed him into a trusted informant, is unreasonable.  Def. Mot. 8:6-7.   The

12  government cannot force anybody into becoming an informant and cannot guarantee the secrecy

13  of an arrest or subsequent contacts of the arrestee with law enforcement.

14      Further, in adopting a realistic, common-sense approach to the necessity analysis in this case,

15  the court must consider the entire duration and context of the investigation.  The goals of the

16  investigation that were specified in the September 2006 affidavit were not limited to developing

17  a prosecutible case against just Nam Nguyen, but extended to the entire organization that San

18  Jose DEA agents had been investigating from on or about May 2006 through September 2006,

19  when they initially identified the defendant as Linh Nguyen's ecstasy source.  Thus, the necessity

20  analysis for the Parks affidavit must include whether any given law enforcement technique would

21  have been successful not only in identifying Nam Nguyen as an ecstasy source but also in

22  developing a prosecutable case against all the other members of their organization, their drug

23  sources, and their drug customers.  In this regard, for example, the court must analyze whether

24  the use of the CSs would have been successful in identifying the drug sources of the Nam

25  Nguyen DTO ; the actual importers of the ecstasy; the primary customers.  It is self-evident that

26  even if the Nam Nguyen DTO investigation had developed and used CSs in this case - when

27  considered in conjunction with all other available law enforcement techniques - CSs could not

28  have achieved the numerous legitimate goals of the investigation.

1    In <u>United States v. Fernandez</u>, 388 F.3d 1199, 1235-1237 (9th Cir. 2004), the Ninth Circuit

2    rejected a defendant's argument that a wiretap affidavit lacked the requisite showing of necessity

3    because two confidential sources were able to provide significant information regarding the

4    activities of a principal member of the organization.  The court cited <u>United States v. Shyrock</u>,

5    342 F.3d 948, 976 (9th Cir. 2003), where a similar argument was rejected in a case involving a

6    wiretap affidavit which described seven informants:

> [T]he Mexican Mafia is a broad-based organization with several hundred members and an
> unknown number of associates.  Several informants - including former members of the
> Mexican Mafia... - could not possibly reveal the full nature and extent of the enterprise and
> its countless, and at times disjointed, criminal tentacles.  <u>Fernandez</u>, 388 F.3d at 1236.

In short, given the nature of the Nam Nguyen DTO, it would have been impossible for the

CSs to have provided sufficient evidence to agents to develop a prosecutible case beyond a

reasonable doubt as to all of its members.

Finally, the defendant's reliance on <u>Blackmon</u> regarding the use of confidential sources fails

for reasons already stated <u>supra</u>.  In short, unlike <u>Blackmon</u>, ours is not a case where DEA had

any confidential sources available to them who had grown up with the defendant and had

intimate knowledge of his drug trafficking activities.  Nor is ours a case where the affidavit was

replete with material omissions and falsehoods.

b. <u>Undercover agents & Buy/Bust Operation</u> (pages 40-41, Parks affidavit)

1. <u>Undercover agents</u>

The government was unable to use undercover agents in the Nam Nguyen DTO investigation

for the same reasons articulated regarding CSs.  Since law enforcement lacked a CS as part of the

San Jose Nam Nguyen DTO investigation, they were unable to consider an undercover officer.

(Parks aff. ¶65).  The defendant appears to agree with this conclusion.  (Def. Mot. 8: 11-13).

Moreover, even if an undercover agent had been successfully inserted into the Nam Nguyen

DTO, it is extremely unlikely that they ever would have also been able to meet or identify other

traffickers affiliated with the DTO, much less have been able to meet actual ecstasy importers.

2. <u>Buy-Bust Operation</u>

When agents employ the "buy-bust" technique, they have no assurance that the person or

GOVT'S OPP. TO DEF. KIM MAI'S MOTION TO SUPPRESS WIRETAP EVIDENCE AND FOR
HEARING REGARDING NECESSITY          14

persons arrested will agree to cooperate.  If a buy-bust had occurred involving the drug trafficking organization in this case and the arrestee or arrestees then refused to cooperate with law enforcement agents, the investigation would have become compromised.  Furthermore, the person or persons arrested often do not have access to all of the subjects of the investigation and are therefore unable to assist in building a case against all the subjects of the investigation.  There was no assurance that arresting any known members of the organization in this case would have resulted in the identification of all members of the organization, much less satisfy the numerous goals of the investigation.

The defendant opines, with some level of incredulity, that agents arrested Son and Duc Nguyen prior to their completing a cocaine base ("crack" cocaine) transaction with Huy Ngo (a source of supply for Nam Nguyen) on February 4, 2007.   She further states that the "investigation of "Nam, Huy and Jimmy" continued on without apparent concern that the investigation was going to be compromised."[2]  Def. Mot. 9:1-5.  What the defendant fails to mention is that Son and Duc Nguyen were arrested on a pretext stop seemingly conducted by local authorities.  Huy Ngo was not arrested on that particular occasion.  Finally, agents would not have known about the February 2007 drug deal (time, place, location, parties involved) had they not been intercepting telephone conversations over a telephone subscribed to and used by Huy Ngo.

c. <u>Physical Surveillance</u> (pages 41-49 , Parks affidavit)

The Parks affidavit refers to surveillances conducted on the Nam Nguyen organization on ten different dates during May through August 2006.  None of these surveillances were successful in observing meetings and transfers of suspected drugs and cash between the co-conspirators.

As SA Parks stated in his affidavit, constant surveillance would have increased the chances of agents being detected and would have jeopardized the investigation before the entire

_____

[2]The wiretap investigation on Nam Nguyen ended in October 2006, approximately four months prior to the Huy Ngo-Son/Duc Nguyen cocaine base deal on February 4, 2007.  By this time, agents had sufficient evidence to proceed against Nam Nguyen and now had what they required to additionally prosecute Huy Ngo.  None of this evidence would ever likely have been obtained without the benefit of a wiretap investigation.

1   organization could have been identified and dismantled.  If the targets of the investigation would

2   have been alerted to the presence of surveillance, they would have been likely to modify or

3   terminate their illegal activities to avoid detection by law enforcement.  Though surveillance may

4   have enabled investigators to identify interceptees and their associated locations, it did not,

5   standing alone, identify the contents of their conversations.

6        Here, the surveillances conducted by DEA yielded insufficient information about the

7   organization's sources of supply, methods for distribution, narcotics customers, importers, major

8   buyers, and other co-conspirators.  Nevertheless, the defendant argues, that "two of these

9   surveillances could have led to useful information had the agents only followed up on them."

10  Def. Mot. 18: 9-11.  Specifically, the defendant refers to their surveillance of Nam Nguyen on

11  one occasion at Thoa Café in San Jose, California and another occasion in which agents

12  supposedly observed a "person enter Nam's house with a brown bag and left without it shortly

13  afterward."  Def. Mot. 9: 6-14.  First, the surveillance section of Parks' affidavit does not include

14  a description of observing anyone with a brown bag enter and leave Nam Nguyen's residence.

15  Nor can such a description be located elsewhere in the affidavit.  Second, even if agents had

16  observed such an incident, as the court is aware, the mere transfer of undetermined objects

17  between the co-conspirators could not have supported a prosecution in this case unless

18  corresponding arrests were also made - which arrests would have been subject to the same

19  limitations and difficulties discussed above in the Buy-Bust Operation section of this

20  memorandum.  Finally, what further steps agents could have taken subsequent to seeing Nam

21  Nguyen at the Thoa Café in order to meet the goals of the investigation remains a mystery.

22  Merely observing a person or persons together does not produce evidence beyond a reasonable

23  doubt of a criminal narcotics conspiracy.  Indeed, the only method for determining what business,

24  if any, was being transacted at the Thoa Café would likely be wiretap conversations (which were

25  later obtained pursuant to the wiretap order authorized by Judge Fogel).

26       In sum, here, the agents conducted more than "desultory surveillance" on Nam Nguyen,

27  which was not the case in either the Blackmon or Gonzalez cases relied upon by the defendant.

28  Here, the surveillance led to insufficient evidence regarding the DTO.  As the Ninth Circuit has

1    observed, "government investigators...are entitled to use reason and common sense in the

2    performance and documentation of their investigations...the statute does not mandate the

3    indiscriminate pursuit to the bitter end of every non-electronic device."  United States v. Baker,

4    589 F.2d 1008, 1013 (9th Cir. 1979).

5      d. Pole Cameras & Tracking Devices (pages 49-51, Parks affidavit)

6     1. Pole Cameras

7      The installation of a pole camera was considered and discounted by agents primarily because

8    the agents did not believe that Nam Nguyen's residence, which he shared with others, was being

9    used as a place where he conducted his illegal activities.  Parks Aff. ¶91.  Parks also stated that

10    the risk involved in being discovered outweighed any benefits that could be derived from the

11    installation of a pole camera.  Even the defendant agrees with this conclusion and states

12    "perhaps it is true that the likelihood of using a pole camera in Nam Nguyen's neighborhood

13    would have been unlikely to reveal useful evidence."  Def. Mot. 10: 8-9.  But, she argues, a pole

14    camera is "inexpensive" and "might have revealed the existence of a regular customer who could

15    have been arrested and turned into an informant."Id. at 9-11.  Again, there is no relevant

16    authority offered by the defendant to support this argument.  To the contrary, law enforcement

17    officials need not exhaust every conceivable investigative technique before obtaining a wiretap.

18    United States v. Commito, 918 F.2d 95, 98-99 (9th Cir. 1990).

19     2. Tracking Devices

20      Parks states that while a tracking device was considered by agents, it was not pursued given

21    the inherent risk of discovery and its limited value that is, in producing evidence which would

22    assist agents in developing evidence of this criminal conspiracy.  Parks Aff. ¶95.  And, as stated

23    immediately supra, agents are not required to exhaust every investigative tool before obtaining a

24    wiretap.  Moreover, as the Ninth Circuit held in United States v.Brone, 792 F.2d 1504, 1506 ('9th

25    Cir. 1986) the "necessity requirement means that the affidavit must set out a factual background

26    that shows that ordinary investigative procedures, employed in good faith, would likely be

27    ineffective in the particular case."

28    // //

e. <u>Acquisition of trash & Mail covers</u>(pages 51-54, Parks affidavit)

1. <u>Trash runs</u>

As described in the September 2006, on three occasions, agents conducted searches of the trash at the residence of Nam Nguyen. None of these searches yielded anything of evidentiary value. Agents noticed that during the acquisition of the trash, the trash receptacles were located in front of the residence which might have proven to be an obstacle to successful future covert trashes searches at these locations. The use of further trash searches would have exposed those agents who acquired the trash to safety issues, given that the trash would have been obtained in a covert manner that could have led to possible confrontation with the target, his associates, or the public. Any such confrontation might easily have compromised the investigation. Further, it is clear that drug traffickers go to great lengths to destroy possible incriminating evidence and frequently will not use their residential trash containers to dispose of valuable information or will shred information. Trash searches, even if conducted in conjunction with other conventional methods of investigation, would not have achieved the numerous goals of this investigation.

2. <u>Mail covers</u>

Parks stated in his affidavit that both San Jose DEA and counterparts in San Diego, California had sought mail covers in order to obtain information regarding the Nam Nguyen DTO activities. Parks Aff. ¶100. However, none of the mail covers produced useful evidence.

f. <u>Telephone toll record and Pen Register Analysis</u> (pages 54-55, Parks affidavit)

Agents obtained pen register and trap and trace orders for Nam Nguyen's cell phone, the same telephone which was the subject of a wiretap order authorized by Judge Fogel on September 5, 2006. They also conducted telephone toll analysis linking these subject telephone numbers with other phone numbers associated with targets of the investigation. Though information obtained from the pen register and trap and trace orders was helpful in establishing a clear pattern of contacts between the target telephones and other suspected drug traffickers, this information was of limited use for evidentiary purposes. These records served merely to confirm contacts between two telephones, but they did not provide the nature or substance of the conversations, nor did they provide the identities of the callers. Cellular telephone subscriber

1   information obtained on telephone numbers may identify a subscriber, but that does not

2   necessarily mean that that individual is the person utilizing the telephone.  Pen registers, trap and

3   traces, and telephone toll analysis could not, standing alone, establish proof of the involvement of

4   various members of the conspiracy.  Agents conducted pen register analysis for numerous

5   months before applying for wiretap authorization for Nam Nguyen's cell phone and the

6   unaccomplished goals of the investigation were legion.

7          Some investigative techniques – including telephone toll records and pen registers – are

8   by their very nature of limited usefulness.  For example, in Brone, 792 F.2d at 1506, the Ninth

9   Circuit affirmed the necessity showing of a 45-page affidavit, in part on the basis that the

10  affidavit "stated . . . that pen registers and toll records did not disclose the nature of the business

11  being transacted by telephone."  See also Bennett, 219 F.3d at 1121-22  (quoting United States v.

12  Brown, 761 F.2d 1272, 1276 (9th Cir. 1985):  "'telephone records, though raising the suspicion

13  that illegal activity was occurring, failed to identify specific users or reveal the substance of the

14  conversations'"); Carneiro, 861 F.2d at 1177 (affirming necessity showing and noting that "the

15  affidavit set forth facts showing that examination of McNeil's telephone records and the use of a

16  pen register on his telephone line did not reveal the contents of the telephone conversations or

17  establish the identity of the persons called").

18         Again, the defendant relies upon Blackmon to argue that the pen register analysis was

19  insufficient.  Def. Mot. 18: 1-5.  Blackmon is inapplicable on the facts of our case.  The

20  defendant does not claim any misrepresentation or omission here; she simply disagrees with the

21  district court's conclusion.  The defendants many arguments notwithstanding, necessity for a

22  wiretap is not evaluated by the government's need to collect some evidence or any evidence

23  rather, to develop an "effective case" against those involved in the conspiracy; an "effective

24  case" is defined as evidence of guilt beyond a reasonable doubt.  United States v. Decoud, 456

25  F.3d 996, 1007 (9th Cir. 2006).  Pen register and toll analysis cannot enable agents to meet this

26  heavy burden as Parks outlined in his affidavit.

27         g. Grand Jury Subpoenas (pages 55-57, Parks affidavit)

28         At the time that agents applied for the wiretap order for the defendant's cell phone on

**GOVT'S OPP. TO DEF. KIM MAI'S MOTION TO SUPPRESS WIRETAP EVIDENCE AND FOR
HEARING REGARDING NECESSITY**            19

September 5, 2006, a financial investigation had been initiated on Nam Nguyen. However, as of that same date, agents had been unable to determine where Nam Nguyen held his bank account(s). Similarly, agents in San Diego, California had likewise been unable to determine where Linh Nguyen, Nam Nguyen's brother, held any financial accounts. Parks Aff. ¶107. Even if any such accounts had been identified, it was highly unlikely that a financial investigation in and of itself would have led to the identification and successful prosecution of the organization's sources of supply, importers, transporters, financiers, distributors, couriers, and major customers.

Defendant argues that agents followed Nam Nguyen into two different banks during one surveillance in June 2006 but made no efforts to confirm whether Nam Nguyen had an account at either one. Def. Mot. 19: 4-5. However, this is not an accurate statement of Parks affidavit in which Parks states that "financial institutions used by Nam Nguyen and Linh Nguyen have not yet been identified." Parks Aff. ¶107. Again, in support of her argument, defendant relies upon Blackmon which for reasons already argued supra, is inapplicable to the facts of the instant case.

h. Subject & Witness Interviews (pages 57-58, Parks affidavit)

As stated above, efforts were made to determine where Nam Nguyen conducted financial transactions. While that component of the investigation yielded no results, in any event, financial records might have eventually shown evidence of money laundering or unexplained income but, they would not reveal anything about the organization's methods of narcotics importation or distribution.

DEA agents were not aware of any person or persons who could have been subpoenaed before the grand jury who would have provided significant and truthful evidence concerning the continuing operation under investigation. The persons who were knowledgeable about the crimes being committed were those involved in it, or their close family and friends. Those involved in the crimes would have been risking conviction and significant prison terms if they testified truthfully. Their close family members or friends would have had to abandon personal loyalty to the suspects and risk endangering themselves and their families by coming forward as witnesses. Attempts to subpoena additional witnesses might readily have alerted the targets to the continuing investigation and caused them to become more secretive than they already were,

1  and would have made it even more difficult to attain the numerous goals of this investigation.

2      It is likely that anyone subpoenaed to appear before the grand jury would have denied any

3  involvement in any criminal activity and would have asserted their Fifth Amendment privilege

4  against self-incrimination.  Interviews of the targets of this investigation or their known

5  associates would likely have resulted in a significant number of untruthful responses to questions

6  or other false information, thereby diverting the investigation with false leads or otherwise

7  frustrating the investigation.  Additionally, such interviews also could easily have had the effect

8  of alerting the members of the conspiracy, thereby compromising the investigation and resulting

9  in the possible destruction or concealment of documents and other evidence, and the possibility

10 of harm to persons suspected of cooperating in the investigation.

11     The defendant essentially argues that no wiretap order should ever be issued unless agents

12 have first approached known members of the organization and attempted to enlist their

13 cooperation.  The law does not require that such an extravagant and dangerous step be taken.

14     i. Search warrants (pages 57-58, Parks affidavit)

15     At the time of the application for the wiretap order for the defendant's cell phone, agents

16 were unaware of the location of any stash houses where the Nam Nguyen DTO may have stored

17 its drugs – ecstasy and marijuana.  Moreover, even if they had possessed probable cause to obtain

18 a search warrant for a particular location associated with the DTO, it is highly unlikely that the

19 execution of search warrants, even if successful in seizing large amounts of drugs or other

20 evidence, would have produced proof beyond a reasonable doubt of the guilt of the

21 organization's higher sources or importers.  Also, once a search warrant is executed, knowledge

22 of the investigation would have spread rapidly among the co-conspirators, and the investigation

23 would have thereby been compromised by an increased risk of flight, hiding, or destruction of

24 other evidence by co-conspirators having been alerted to law enforcement's interest in them.

25     C. Summary of argument regarding requisite necessity for wiretap order

26     In order to demonstrate the requisite necessity for a wiretap affidavit, agents need not exhaust

27 every conceivable technique or potentially productive method.  Instead, they must show that

28 normal investigative techniques employing a normal amount of resources failed to achieve the

GOVT'S OPP. TO DEF. KIM MAI'S MOTION TO SUPPRESS WIRETAP EVIDENCE AND FOR
HEARING REGARDING NECESSITY                21

1 goals of the investigation within a reasonable period of time.

2    In this case, it cannot be said that the agents used wiretap surveillance as the initial step in the

3 investigation or prematurely. The agents utilized a broad spectrum of conventional investigative

4 techniques for four months in an attempt to identify and obtain evidence against all of the

5 members of the conspiracy prior to seeking authorization to conduct electronic surveillance.

6 Prior to applying for the September 5, 2006 wiretap order, DEA spent enormous resources and

7 money pursuing wiretap investigations of Linh Nguyen, David Bailey and Chi Bui before they

8 were finally able to identify Nam Nguyen as Linh Nguyen's ecstasy source. It was only after the

9 unsuccessful use of conventional investigative techniques that agents turned to electronic

10 surveillance, the only technique offering a reasonable likelihood of success in dismantling the

11 entire target organization. As stated previously, the goals of the investigation were extensive and

12 included identifying and developing proof beyond a reasonable doubt against the drug sources of

13 the DTO as well as identifying customers; stash houses and the financial components to the

14 DTO. Moreover, in support of its wiretap application, the government carefully explained its

15 efforts to investigate the organization and described, in detail, the relative successes and failures

16 of those efforts and the need for electronic surveillance. After careful review, and in a proper

17 exercise of discretion, Judge Fogel agreed that the requisite necessity for a wiretap order had

18 been established. The defendant does not explicitly claim that Judge Fogel abused his

19 considerable discretion in this matter, nor has she provided evidence or authority to support such

20 a claim.

21    The following refreshing language is directly on point in this case:

22    Here, the government is to be commended for its interest in wiretap evidence, which,
      compared to the word of an informant either in the field or in court, is the gold standard when

23    it comes to trustworthy evidence. The truth-seeking function of our courts is greatly
      enhanced when the evidence used is not tainted by its immediate informant source and has

24    been cleansed of the baggage that always comes with them. Moreover, wiretap evidence out
      of the mouths of defendants is valuable corroboration of informant testimony. Such evidence

25    serves also to ensure that what investigators are being told by informants is accurate, a very
      valuable function that guards against the indictment of the innocent. Canales-Gomez, supra.,

26    358 F.3d at 1227.

27 // //

28 // //

GOVT'S OPP. TO DEF. KIM MAI'S MOTION TO SUPPRESS WIRETAP EVIDENCE AND FOR
HEARING REGARDING NECESSITY                    22

1

<u>CONCLUSION</u>

2
    For the aforegoing reasons, the defendant's motion to exclude the contents of, and the

3
evidence derived from, the September 5, 2006 wiretap order issued in this case and for a hearing

4
should be denied.

5

6
DATED: _____                    Respectfully submitted,

7
                                  JOSEPH P. RUSSONIELLO
United States Attorney

8

9

10
                                    SUSAN R. JERICH
Assistant United States Attorney

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28