# EXHIBIT A

# CR 07-00289 RMW

Docket # 55

KEVIN V. RYAN (CSBN 118321)
United States Attorney

MARK KROTOSKI (CSBN 138549)
Chief, Criminal Division

SUSAN R. JERICH (CSBN 188462)
Assistant United States Attorney

    450 Golden Gate Avenue
    San Francisco, California
    Telephone: (415) 436-7200
    Facsimile: (415) 436-7234
Attorneys for Applicant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES FOR AN ORDER AUTHORIZING THE INITIAL INTERCEPTION OF WIRE COMMUNICATIONS OVER CELLULAR TELEPHONE NUMBER 408-314-6063 | ) ) ) ) ) ) ) ) ) ) ) |

No. CR

AFFIDAVIT OF DEA SPECIAL
AGENT SAMMY A. PARKS

**FILED UNDER SEAL**

## I. INTRODUCTION

1.    I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an Officer of the United States empowered in Title 18 U.S.C. § 2516. I am a Special Agent with the Drug Enforcement Administration ("DEA") United States Department of Justice.    I have been employed by the Drug Enforcement Administration (DEA) as a Special Agent since December 12, 2004 and am currently assigned to the San Francisco Field Division, San Jose Resident Office.

2.    Prior to becoming a DEA Special Agent, I was a Police Officer from 1996 to 2004 [eight (8) years] with the Galveston, Texas Police Department. In my capacity as a DEA Special Agent, I investigate federal narcotics and money laundering offenses, including but not limited

1

1 | to, those enumerated in Title 21, United States Code, §§ 841, 843(b), and 846. I have received

2 | training and course instruction from DEA relating to investigative techniques and the conduct of

3 | narcotics and financial investigations. Prior to working as a DEA Special Agent, I attended and

4 | graduated from the DEA Basic Agent Training Program in Quantico, Virginia. At the DEA

5 | Basic Agent Training Program, I received several hundred hours of comprehensive, formalized

6 | instruction in the recognition, distribution, manufacturing and packaging of controlled

7 | substances, as well as money laundering techniques and asset forfeiture. My experience as a

8 | Police Officer with the Galveston, Texas Police Department included working as a Sergeant with

9 | the Criminal Investigative Division (CID). In this capacity, I participated in multiple felony

10 | investigations. As a Galveston Police Officer I have conducted and participated in over one

11 | hundred narcotic related investigations.

12 | 3.    I have spoken to, and worked with, more experienced federal, state and municipal

13 | narcotics agents and officers. Furthermore, during the course of my employment as a DEA

14 | Special Agent, I have participated in several investigations of illicit drug trafficking

15 | organizations. These investigations have involved the use of confidential informants, wire and

16 | physical surveillance, telephone toll analysis, investigative interviews, and the service of search

17 | and arrest warrants. Criminal acts conducted in these investigations include the

18 | unlawful importation, possession with intent to distribute, and distribution of controlled

19 |

20 | substances, as well as the related laundering of monetary instruments, monetary transactions

21 | involving the proceeds of specified unlawful activities, and conspiracies associated with criminal

22 | narcotics offenses, in violation of Title 21, United States Code, Sections 841(a)(1) and 846

23 | 4.    I have been involved in the execution of numerous state and federal narcotic

24 | search warrants. As a result, I have encountered and become familiar with the various tools,

25 | methods, trends, paraphernalia, and related articles used by traffickers and trafficking

26 | organizations in their efforts to import, conceal, manufacture, and distribute controlled

27 |

28 | substances. Furthermore, I have interviewed drug dealers, users, and confidential informants and

have discussed with them the lifestyles, appearances, and habits of drug dealers and users. I have

000070

1 become familiar with the manner in which narcotics traffickers smuggle, transport, store, and

2 distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar

3 with the manner in which narcotics traffickers use telephones, cellular telephone technology,

4 pagers, coded communications or slang-filled telephone conversations, false or fictitious

5

6 identities, and other means to facilitate their illegal activities and thwart law enforcement

7 investigations

8 5.    Based upon my training and experience, I know that it is common practice for

9 narcotics traffickers to routinely utilize pagers, telephones, and cellular telephones in order to

10

11 communicate with their customers, suppliers, couriers, and other co-conspirators and in order to

12 insulate themselves from detection by law enforcement. Moreover, it is not unusual for them to

13 initiate such service under associates names or fictitious names. Furthermore, it is not unusual

14

15 for narcotic traffickers to utilize fictitious and/or incomplete address(es) on applications related

16 to the purchase and utilization of their cellular phone(s).

17 6.    My awareness of these drug trafficking practices, as well as my knowledge of

18 drug use and distribution techniques as set forth in this Affidavit, arises from the following: my

19 own involvement in drug investigations and searches during my career as a law enforcement

20 officer, as previously described; my involvement in what other agents and police officers have

21

22 advised me when relating the substance of their similar debriefings and the results of their own

23 drug investigations; and other intelligence information provided through law enforcement

24 channels.

25 II. PURPOSE OF AFFIDAVIT

26 7.    This affidavit is submitted in support of an application authorizing the intercept of wire

27 communications for a thirty (30) day period pursuant to 18 U.S.C. § 2516 to and from the

28

3

000071

1    following Target Telephone:

2        A cellular telephone currently assigned telephone number 408-314-6063, bearing ESN
3        Number 06906886919, hereinafter referred to as **Target Telephone #1**. This is a
         VerizonWireless, Cellular phone, subscribed to **Nam Hoang NGUYEN**, 2655 El Camino
4        Real, Santa Clara, California, 95051.

5    I anticipate that the interception of wire communications will provide evidence of the following

6    offenses enumerated in 18 U.S.C. §2516:

7

8    a.    The Possession with Intent to Distribute and the Distribution of Controlled Substances,
           namely 3,4 methylenedioxymethamphetamine (MDMA) also known as Ecstacy and
9          Marijuana in violation of 21 U.S.C. § 841.

10   b.    Conspiracy to Commit those Offenses, in violation of 21 U.S.C. § 846 and 963;

11

12   c.    The Use of Communications Facilities to Facilitate the above-listed offenses, in violation
           of 21 U.S.C. § 843(b); and

13

14   d.    Violations involving financial transactions and the transportation, transmission, or
           transfer of monetary instruments that represent the proceeds derived from the
15         manufacture, sale, or distribution of a controlled substance, in violation of Title 18 U.S.C.
           Section 1956, and  conspiracy to commit the above offenses, in violation of 18 U.S.C.
16         Section 1956(h); and  engaging or attempting in monetary transactions of criminally
           derived property, in violation of  18 U.S.C. Section 1957, which offenses have been
17         committed and are being committed by   the  persons names below in Section III of this
           affidavit entitled, " TARGETS OF INVESTIGATION" AND "POSSIBLE
18         INTERCEPTEES".

19

20   8.    This investigation is currently a unilateral DEA investigation to include the San Jose Police

21   Departments Narcotics Division.  The statements contained in this affidavit are based on

22   information I have learned through my personal participation in this investigation, from oral and

23   written reports of other law enforcement Officers, from records, documents and other evidence

24

25   obtained during this investigation and from my experience and training as a Special Agent of the

26   DEA. Since this affidavit is being submitted for the limited purpose of securing authorization for

27   the interception of wire communications over **Target Telephone #1**, I have not included each

28

                                          4

000072

1   and every fact known to me concerning this investigation. I have set forth only the facts that I

2   believe are necessary to establish the requisite foundation for an order authorizing the

3   interception of wire communications over **Target Telephone #1**. Based on the facts set forth

4   

5   herein, I believe that there is probable cause to believe that the individuals listed as Possible

6   Interceptees and Target Subjects of the investigation below, and others as yet unknown, have

7   committed and are committing and will continue to commit the following crimes:

8       a.   The Possession with Intent to Distribute and the Distribution of Controlled Substances,
9            namely 3,4 methylenedioxymethamphetamine (MDMA) and marijuana, in violation of 21
10           U.S.C. § 841.

11      b.   Conspiracy to Commit those Offenses, in violation of 21 U.S.C. § 846;

12      c.   The Use of Communications Facilities to Facilitate the above-listed offenses, in violation
13           of 21 U.S.C. § 843(b); and

14      d.   Violations involving Money Laundering and the transportation, transmission, or transfer
15           of monetary instruments that represent the proceeds derived from the manufacture, sale,
             or distribution of a controlled substance, in violation of 18 U.S.C. Section 1956, and
16           Conspiracy to commit the above offenses, in violation of 18 U.S.C. Section 1956(h); and
             Engaging or attempting in monetary transactions of criminally derived property, in
17           violation of 18 U.S.C. Section 1957.

18  9.    In particular, these communications are expected to concern the specifics of the above

19  offenses, including:

20      a.   The manner, scope and extent that the TARGET TELEPHONE is being used to

21           facilitate the above offenses, which supports the existence of a conspiracy and

22           which provides evidence of the identities and roles of the TARGET SUBJECT,

23           

24           co-conspirators, and the precise nature and scope of their illegal activities;

25      b.   The identities of co-conspirators, accomplices, and aiders and abetters of the

26           conspiracy, including the leaders of the organization in Santa Clara County,

27           California and elsewhere, and all sources of supply;

28

000073

c.   The distribution network used by the TARGET SUBJECT and his co-conspirators, including the method by which they transport ecstasy into the United States and then from the stash locations, and distribution locations, the manner and method by which the narcotic substances are packaged and/or concealed, and the catalog of names and locations of criminal participants from the first point of manufacture to the street delivery of ecstasy;

d.   The dates, times, places, schemes, and methods used by the TARGET SUBJECT and co-conspirators for manufacturing, selling, buying, possessing, concealing, transporting and distributing ecstasy;

e.   The dates, times, places, schemes, and methods used by the TARGET SUBJECT and co-conspirators for disposing of the proceeds derived from the trafficking of ecstasy;

f.   The location of stash houses, and sites used by the TARGET SUBJECT and associates, accomplices and co-conspirators to manufacture ecstasy and other controlled substances;

g.   The location of financiers, managers and supervisors of the ecstasy manufacturing and distribution operation;

h.   The existence and location of the books and records, computer disks, ledgers, telephone address books, telephone answering devices, photographs, video tapes, cassette tapes, and all other documents relating to the above offenses;

I.   The methods by which the illicit proceeds are transported from the distribution areas to their final destination;

6

000074

j.  The identity and location of assets, which may be subject to seizure or forfeiture, which have been accumulated by the TARGET SUBJECT and co-conspirators as a result of their illegal activities;

k.  The identity of the communication facilities including residential telephones, business telephones, pay telephones, fax machines, computer communications systems, voice mail systems, digital pagers and/or cellular telephones commonly used by the TARGET SUBJECT and associates, accomplices and co-conspirators to facilitate the activities described herein;

l.  The location and disposition of the proceeds from the above activities; and

m.  Admissible evidence of the commission of the above offenses and proof beyond a reasonable doubt of the intent of each of the participants to join and participate in the conspiracy knowingly and willingly.

10.  Normal investigative procedures, have been attempted in furtherance of this investigation and have failed to achieve the goals of this investigation. Additional efforts to employ normal investigative techniques reasonably appear unlikely to succeed in the future, or appear to be too dangerous to utilize, and they reasonably appear unlikely to reveal the full scope of the unlawful activities, the roles of the individuals involved, or the identities of the other participants. A full and complete statement explaining why normal investigative procedures either have been tried and have failed reasonably appear unlikely to succeed if tried, or to be too dangerous if tried, is contained in Section VIII of this affidavit, NEED FOR INTERCEPTION OF WIRE COMMUNICATIONS.

11.  On April 25, 2006, an Application in support of an Order Authorizing the Interception of Wire Communications over telephone number 619-980-7716, was submitted to, and signed by, the Honorable Marilyn L. Huff, United States District Judge, Southern District of California.

000075

1    Interception of telephone number 619-980-7716 pursuant to this order commenced on April 25,

2    2006 and ended on May 24, 2006. The Affidavit attached to the aforementioned Application

3    submitted on April 25, 2006 pertaining to telephone number 619-980-7716 (hereinafter referred

4    to the"April 25, 2006 Affidavit") was previously filed with the District of California court under

5    seal and is available to the court in its court file. The April 25, 2006 Affidavit is incorporated by

6    reference in this Affidavit, as if fully set forth herein.

7

8        III. POSSIBLE INTERCEPTEES AND TARGET SUBJECTS

9    12.    Based on the information contained in this affidavit, I believe that communications by

10   the following persons, and others yet unknown (hereinafter referred to as interceptees), related

11   to the offenses described above may be overheard if authorization for the requested interception

12   of wire communications is granted:

13

14       a. Nam Hoang NGUYEN

15   **Nam Hoang NGUYEN** is the listed subscriber to **Target Telephone #1.** NGUYEN is a

16   United States citizen. NGUYEN was convicted of first degree robbery and second

17   degree burglary on February 15, 1994, San Diego, California. His current residential

18   address listed on his California Drivers License is 2655 El Camino Real, Santa Clara,

19   California.[1] On December 2, 2005, **Nam Hoang NGUYEN** was intercepted by DEA San

20   Diego agents offering to show **Chi BUI ("BUI")** how to sell ecstasy. On May 18, 2006,

21   DEA San Diego agents intercepted a call between **Target Telephone #1 (Nam Hoang**

22   **NGUYEN)** and **Linh Phuc NGUYEN** discussing ecstasy and marijuana connections.

23

24   // //

25

26   _____

27       [1]Your affiant conducted a Lexis/Nexis inquiry and determined based upon that inquiry
     that **Nam Hoang Nguyen's** listed residential address is 2655 El Camino Real, Santa Clara,
28   California. Subsequently, your affiant has determined that this address is in fact not a residential
     address at all rather, it appears to be a place of business at which your affiant believes **Nam**
     **Hoang NGUYEN** is employed.

                                      8

b. Linh Phuc NGUYEN

Linh Phuc NGUYEN, is a United States citizen. On January 9, 1997, **Linh Phuc
NGUYEN** was arrested for armed robbery. He was convicted and sentenced to the
California Youth Authority. In March 2003, **Linh Phuc NGUYEN** was arrested with
two associates after they sold three-thousand ecstasy pills to an undercover DEA Agent.
**Linh Phuc NGUYEN** was not prosecuted for this offense. His current residential
address is 4259 36th Street #7, San Diego, California. On May 18, 2006, San Diego DEA
agents intercepted a call between **Linh Phuc NGUYEN** and **Target Telephone #1**
discussing ecstasy and marijuana connections.

c. Chi Thien BUI

**BUI** is a United States citizen. **BUI's** current residential address is 9534 Galvin Avenue,
San Diego, California. In 1994, **BUI** was convicted for the felony offense of assaulting a
person with a firearm in San Diego County and was sentenced to the California Youth
Authority. **BUI** was convicted in 2000 for the misdemeanor offense of providing false
identification to a peace officer in San Diego county. **BUI** was sentenced to a
probationary term. Thus far, the investigation reveals that **BUI** is a significant distributor
of 3,4 methylenedioxymethamphetamine (MDMA),commonly known as "ecstacy". San
Diego DEA agents have purchased more than 6,000 ecstacy pills from **BUI** thus far via a
cooperating Witness (CW). On December 02, 2005, San Diego DEA agents, pursuant to
a Title III investigation, intercepted a call between **BUI** and **Nam NGUYEN** (**Target
Telephone #1**) where **Nam NGUYEN** was offering to show **BUI** how to sell ecstacy.
Although not confirmed, I believe that **BUI** obtains his ecstacy from the San Jose,
California area.

000077

13.     I further believe that the facts below establish probable cause to believe that

**Target Telephone #1** has been and will continue to be used to commit the offenses described

above, and that wire communication concerning the above described offenses will be intercepted

if authorization to intercept the wire communication is granted as requested herein. In particular,

the wire communication will concern, among other things, the possession and distribution of 3,4

methylenedioxymethamphetamine (MDMA) and marijuana; the manner and means of the

transportation and delivery of 3,4 methylenedioxymethamphetamine (MDMA) and marijuana;

the quantities of 3,4 methylenedioxymethamphetamine (MDMA) and marijuana involved; the

importation of 3,4 methylenedioxymethamphetamine (MDMA) and marijuana; the monetary

proceeds generated by the sale of the 3,4 methylenedioxymethamphetamine (MDMA) and

marijuana; the transportation, delivery, and distribution of the monetary proceeds; the identities

and roles of the various participants; and full nature and scope of the conspiracy and related

illegal activities. These communications are expected to constitute admissible evidence of the

commission of these offenses.

## IV. OVERVIEW OF INVESTIGATION

14.     Prior Title III affidavits have been filed by San Diego agents on November 28, 2005,

January 10, 2006 , February 10, 2006 and March 23, 2006, which I hereby incorporate by

reference. Based on the San Diego DEA investigation, it appears that some of the **Target**

**Subjects**, such as **Chi BUI** and **Linh Phuc NGUYEN** assist each other when one is short on

supply of Ecstacy. However, **BUI** and **Linh NGUYEN** each appear to have different sources of

supply. Based on this ongoing investigation, DEA agents believe that **Nam Hoang NGUYEN**

subscriber of **Target Telephone#1** is the source of supply for **Linh Phuc NGUYEN** and others

not yet identified (refer to details fully described below).

10

15.    Evidence gathered to date by San Diego DEA agents indicates that an individual named **Chi BUI** is a significant ecstasy distributor in the Southern California area. San Diego DEA agents became aware of **BUI** through another ecstasy distributor named Hai TRINH ("TRINH"), who was introduced to agents through a confidential witness (CW-1) in February 2005, which is more fully explained in DEA San Diego's November 28, 2005 affidavit. The evidence revealed that TRINH obtained ecstasy from **BUI**. With the assistance of CW#1, investigating agents were able to make several boat-sized (1000 pill) purchases of ecstasy from both **BUI** and TRINH. However, the purchases provided no insight as to who was supplying ecstasy to **BUI**.

Additionally, on January 5, 2006, the CW purchased 1000 pills of ecstasy from an individual identified as Tuan Lat LE ("LE"). Further, during the same time pen register analysis revealed that LE was in contact with Linh Phuc NGUYEN. It is suspected that Linh Phuc NGUYEN could be the source of supply for LE.

16.    On November 28, 2005, San Diego DEA agents received court authorization to intercept wire and electronic communications over telephone number 619-243-6478, a cellular phone used by **BUI**. Two subsequent 30-day periods of wire-only interception on telephone number 619-243-6478 were authorized by the district court, the last being from February 10, 2006 through March 11, 2006. During the course of intercepting wire communications to/from telephone number 619-243-6478, San Diego DEA agents confirmed that **BUI** was distributing ecstasy. Additionally, it appeared through intercepted calls that **BUI** obtained his supply of ecstasy from an individual identified as Ty TRUONG ("TRUONG"), who lives in the Northern California area. Shortly after identifying TRUONG as **BUI's** source of supply, TRUONG ceased supplying ecstasy and became extremely law enforcement conscience. **BUI** then located a new

11

supplier, Tung LNU, who lives in Orange County. However, on or about January 2006, **BUI**
called Tung LNU to complain about the quality of ecstasy he received from Tung LNU.
Although Tung indicated that he would try to rectify the problem, it appears that he did not do so
and simply changed his number and has avoided contact with **BUI**.

17.     On or about February 27, 2006, **BUI** discontinued using telephone number 619-243-
6478 and began utilizing telephone number 619-335-7037 to conduct his criminal activity. On
March 23, 2006, agents obtained authorization to intercept wire communications over **BUI's** new
facility, telephone number 619-335-7037. Since beginning interceptions over telephone number
619-335-7037, **BUI** continued to discuss narcotics-related transactions, notably one involving
approximately 300,000 ecstasy tablets, discussed more fully below.

18.     At the same time the court authorized interception over 619-335-7037, it granted
authority to begin wire interceptions over telephone number 619-245-5552, a facility utilized by
David C. BAILEY, ("BAILEY") aka "Dung." During the authorized interception period, March
23, 2006 to present, there have been numerous narcotics-related conversations involving
BAILEY and other identified and unidentified individuals, discussed more fully below. Based on
these interceptions, BAILEY appears to be a significant ecstasy distributor, independent of **BUI**.
In fact, during conversations intercepted over telephone number 619-335-7037, BAILEY
informed **BUI** that he had previously completed a narcotics transaction in Houston, Texas and
anticipated another such transaction significant enough to enable him to retire.

NARCOTICS SEIZURES

19.     To date, there have been limited seizures of narcotics. In addition to the boats of
ecstasy purchased from **BUI** , TRIHN and LE by the CW (discussed above), on January 1, 2006,
San Diego DEA agents seized approximately 200 pills from an individual named Stephanie

12

1    NIEMANN ("NIEMANN"), as a result of several intercepted calls from telephone number 619-

2    243-6478. San Diego DEA agents learned that **BUI** had arranged to acquire one thousand ecstasy

3    pills from Tung LNU for **Linh Phuc NGUYEN**. Wire intercepts indicated that after the

4    transaction, which occurred in Orange County, **BUI** arranged for **Linh Phuc NGUYEN** to sell

5    200 of the ecstasy pills to another customer of **BUI's**, NIEMANN. The transaction was

6    arranged for the following day. Agents surveilled the transaction, which based on the intercepted

7    calls, appeared to be consistent with a drug transaction. Approximately one hour after the

8    transaction between NIEMANN, **Linh Phuc NGUYEN** and **BUI**, local law enforcement

9    conducted a traffic stop on NIEMANN after she was observed violating a provision of the

10   vehicle code. During the traffic stop, NIEMANN gave consent to search her car and two

11   hundred ecstasy pills were discovered in the trunk. After waiving her Miranda rights,

12   NIEMANN stated that she obtained the pills from an individual she knew as "Tre" (**BUI**).

13   According to NIEMANN, she acquired the ecstasy for a friend of hers. She also stated that she

14   has known "Tre" for about one year and has previously purchased ecstasy from him, always in

15   relatively small quantities. Presently, NIEMANN is being prosecuted by local authorities. The

16   pills with which she was caught tested positive for MDMA (ecstasy) by the DEA Southwest

17   Laboratory and matched those pills that CW#1 purchased from **BUI** earlier that day.

18   20.    Since beginning interceptions over telephone number 619-335-7037 and telephone

19   number 619-245-5552 on March 23, 2006, there have been numerous narcotics-related

20   conversations. Additionally, San Diego DEA agents have identified a new target subject, Hau

21   Cong HA ("HA"). It appears from intercepted conversations over telephone number 619-335-

22   7037, that HA, who lives in the Orange County area, is a potential source of supply for ecstasy.

23   For example, on March 28, 2006, San Diego DEA agents learned that HA informed **BUI** that a

000081

shipment of approximately three hundred thousand (300,000) ecstasy pills is being smuggled into Canada by a group of Chinese traffickers. HA anticipated that the ecstasy would be available for distribution in the United States. HA stated, "Because I want to come down to San Diego ... It's very cheap ... the Chinese music (ecstasy) that they bring over will be in great quantity...around three hundred thousand Chinese CD's. This CD is from Canada." HA also requested Ty TRUONG's telephone number so that he could ask TRUONG how many pills he would like to purchase and to establish a purchase price. HA and **BUI** agreed to speak more about the matter as HA learned more about the shipment.

21.    In an effort to verify HA's criminal associates, DEA agents in Orange County have conducted surveillance of HA and called his telephone while he was under surveillance. Agents observed HA answer the telephone, confirming HA is the user of the telephone intercepted over telephone number 619-335-7037. DEA Agents in Orange County are currently receiving pen register information on HA's phone and are preparing an affidavit in request of an Order authorizing wire interceptions on that facility.

22.    On April 13, 2006, CW-1 met with **BUI** for the purpose of determining whether **BUI** would sell him/her ecstasy. Agents asked CW-1 to inquire of **BUI** in order to determine whether **BUI** would in turn call HA. **BUI** informed CW-1 that he no longer desired to deal in ecstasy because he was making enough money playing poker. However, despite **BUI's** statement that he no longer intended to distribute ecstasy, he has been recently intercepted, as discussed below, discussing narcotics-related business with TRUONG. Based on that call, San Diego DEA agents believed that **BUI** was in the process of seeking an enormous amount of ecstasy, upwards of 1,000,000 tablets, as discussed in the referenced call, for TRUONG. Additionally, based on the call, San Diego DEA agents believe that **BUI** will or has obtained some ecstasy for TRUONG

14

1    from HA. In fact, BUI and HA met on April 18, 2006 at Di Vang II (a coffee in Orange County,

2    CA.). Although agents attempted to surveil the meeting, they were not able to see or hear what

3    occurred between the two.    Intercepted communications over telephone number 619-245-5552

4    also confirm that BAILEY was distributing ecstasy in the San Diego area. As an example, on

5    March 23, 2006, at approximately 7:51 p.m., telephone number 619-245-5552 called **Linh Phuc**

6    **NGUYEN** over telephone number 619-980-7716. BAILEY stated, "Hey...the stuff you gave me

7    last time..." **Linh Phuc NGUYEN** interrupted, "Yeah...what about it?" BAILEY stated, "Fuck!

8    You know how much fucking short in there? Fuck! There were two hundred and twenty seven

9    pills short. Huh?" **Linh Phuc NGUYEN** replied, "What was the total?" BAILEY stated,

10   "There were only 773 pills in there. Fuck! What kind of counting those fuckers did?" Agents

11   interpret this call to mean that BAILEY recently purchased one thousand ecstasy pills (one boat)

12   from **LINH Phuc NGUYEN** and was shorted two hundred and twenty seven pills.

13   <u>EMERGENCE OF LINH PHUC NGUYEN AS A DISTRIBUTOR OF ECSTASY</u>

14   23. **Linh Phuc NGUYEN**'s significance as a buyer of ecstasy emerged in mid-January

15   2006. However, in March 2006, it became apparent that **Linh Phuc NGUYEN** not only

16   purchases ecstasy pills from **BUI**, but also appears to sell them to BAILEY, as detailed in a call

17   below. In addition, according to information learned during an intercepted call between BAILEY

18   and Riverside District Attorney Investigator Mike Gallivan (discussed below), **Linh Phuc**

19   **NGUYEN** recently flew to San Jose, California, for the purpose of picking up 5000 ecstasy

20   tablets and has co-conspirators in San Diego that are distributing the pills for him. Based on the

21   quantity of pills, his prior dealings with BAILEY, and information that he has others selling

22   ecstasy for him, I believe that **Linh Phuc NGUYEN** is a significant distributor who has sources

23   of supply independent of either **BUI** or BAILEY (discussed below). **Linh Phuc NGUYEN** uses

15

1  telephone number 619-980-7716 to conduct his narcotics-related transactions. A summary of

2  pertinent calls is detailed below.

3

4  24. Based on Pen Register/Toll Analysis, **Linh Phuc NGUYEN** has frequent contact with

5  **Nam Hoang NGUYEN** (Subscriber of **Target Telephone #1**), who resides in San Jose,

6  California. **Nam Hoang NGUYEN** was intercepted over telephone number 619-243-6478

7  offering to show BUI how to sell ecstasy. For example, on December 2, 2005, **Nam Hoang**

8  **NGUYEN** called from **Target Telephone #1** to telephone number 619-243-6478 and spoke to

9  BUI. BUI stated, "Fuck! I got money just sitting around...sitting around..." **Nam Hoang**

10 **NGUYEN** replied, "Well...if you want to...and if you have the money sitting around...I can show

11 you how to move stuff..." BUI replied, "Move what?" **Nam Hoang NGUYEN** replied, "Move

12 stuff!" BUI replied, "Move what kind of stuff?" **Nam Hoang NGUYEN** replied, "Candies."

13

14 BUI declined to take him up on the offer.[2] Agents are aware that "candies" is a term used to

15 describe ecstasy pills. Based on the amount of telephone contact between telephone number 619-

16 980-7716 and Nam Hoang NGUYEN, as shown by tolls and pen activity, agents believe **Nam**

17 **Hoang NGUYEN Subscriber of Target Telephone #1** is likely **Linh Phuc NGUYEN's**

18 ecstasy source of supply.

19

20 25.  As previously indicated, BUI is the user of telephone number 619-335-7037. Evidence

21

22 gathered via intercepted communications over telephone number 619-335-7037 has confirmed

23 that BUI was involved ecstasy trafficking in the San Diego area. The following is a sample of

24 pertinent intercepted calls. On March 25, 2006, at approximately 6:06 p.m., agents intercepted

25

26

27

28
_____

16

an outgoing call from telephone number 619-335-7037 to HA. During this call, HA asked, "Remember when I asked you if there was anyone...to dump the grass? Do you remember? Have anyone up there" BUI replied, "I dunno...shit man...mother fucker lately I've been busy taking care of this and that, I haven't asked around for you." Agents believe that this call means HA wants to know whether **BUI** has any customers that want to purchase marijuana.

On March 25, 2006, at approximately 6:08 p.m., agents intercepted an incoming call from HA to telephone number 619-335-7037. HA stated, "It's because this guy he have a lot you understand? **BUI** replied, "But what kind...what kind...is it triple?" HA replied, "Uh...he's got all kinds...he's got three kinds." **BUI** replied, "Let me...let me ask again." Agents interpret this call to mean that HA's marijuana supplier has numerous types of marijuana and has large quantities of marijuana.

26.    On March 28, 2006, at approximately 4:56 a.m., agents intercepted an outgoing call to HA. During this call HA stated, "Chi. Hey Chi. When would you come down? I have a problem to tell you." **BUI** replied, "What is the problem?" HA replied, "Fuck man, I can't talk about this thing." **BUI** asked, "Is it that thing I've asked from the previous day?" HA replied, "It's something different Chi. Ah okay. This thing is a lot more." Agents interpret this call to mean that HA wants to discuss another drug transaction with **BUI** involving a drug other than marijuana which they discussed on March 25, 2006.

27.    On March 28, 2006, at approximately 8:39 p.m., agents intercepted an incoming call from HA to telephone number 619-335-7037. HA stated, "Remember when I asked you about that stuff? Well...I...I...there's this thing...it's candies (ecstasy). Well...now we will call it a CD okay? This is CD from Canada. They asked me about the price of a CD so I am asking you. Because I want to come down to San Diego...It's very cheap...the Chinese music that they bring over will be in great quantity...around three hundred thousand Chinese CD's." **BUI** replied, "Is that so?"

17

1  HA replied, "So I want to ask you how much you can get for one CD? You understand me?

2  How much are they buying a CD down there?" **BUI** replied, "Depending on the quality of the

3  merchandise..." HA replied, "Well...fuck! They say this stuff is good." **BUI** replied, "Well...let

4  me ask my friend and then I'll go up there and talk to you." HA replied, "Hey. What's Ty's

5  ("TRUONG") phone number? When you come up here, bring his number too." Agents interpret

6  this call to mean that HA is aware of a shipment of three hundred thousand ecstasy pills that

7  have arrived or are en route to Canada for distribution in the United States and the pills are being

8  smuggled by drug traffickers of Chinese descent. HA is trying to determine the market value for

9  ecstasy in the San Diego area in order to supply **BUI** with ecstasy pills. HA also knows that

10  **BUI's** brother-in-law, TRUONG, is an ecstasy trafficker and asked for his telephone number to

11  see if he can supply TRUONG with ecstasy.

12  28.  On April 1, 2006, at approximately 8:24 p.m., **BUI** called TRUONG.

13  TRUONG asked, "Buying an extra car?" **BUI** replied, "Um...buy...yes...buy...buying new car."

14  TRUONG asked, " When can you run up and talk to me?" **BUI** replied, "Brother Ty you need to

15  talk to me?" TRUONG replied, "Yeah." **BUI** replied, "I...I...I hope you know I don't live in

16  Orange County anymore." TRUONG replied, "Where at?" **BUI** replied, "I'm staying at S.D. (San

17  Diego) I know you are very busy. Brother Ty you needs to talk to me anything important?"

18  TRUONG replied, "Talk about the computer only." **BUI** replied, "Oh computer?" TRUONG

19  replied, "Yes, the other day that I have talked to you already." **BUI** replied, "Yeah...yeah I

20  remember...I remember." TRUONG replied, "Then at the same time I have a... matter to do

21  business. Talk to you about the matters so you know." **BUI** replied, "Tomorrow morning I might

22  run up there." TRUONG replied, "You just bought what car?" **BUI** replied, "Not buying yet. I

23  just come out to take care of paperwork then see if I want to get it or not." TRUONG replied,

000086

"Fifty Five right?" BUI replied, "S Fifty Five. One hundred thousand." TRUONG replied,

"Wow. I think at this time you shouldn't get that car. Come up here and listen to me talk about

business then you get that car." Agents interpret this call to mean that TRUONG wants BUI to

come see him in person to talk about their drug trafficking activity because he doesn't want to

talk about it over the telephone. Agents are aware from previous intercepts that TRUONG had

been BUI's source of supply for ecstasy pills. As stated before, intercepts revealed that

TRUONG has become paranoid and talks very little and primarily in coded language about his

drug trafficking activity on the telephone. Agents believe TRUONG's reference to a "computer"

is actually a code word for drugs and that TRUONG and BUI have previously arranged to use

this code word on the telephone. Agents believe TRUONG wants BUI to delay the purchase of

the new Mercedes and use the funds intended for the car to acquire a large load of drugs.

29.     On April 6, 2006, at approximately 2:31 p.m., HA called 619-335-7037. HA

stated, "Mother fucker that asshole...that fucking...those candies that he said...for mother fucking

three dollar and fifty cents...mother fucker needs to go die!" BUI replied, "That's a bit

expensive." Agents interpret this call to mean that HA has learned the price of the large shipment

of pills (300,000) that is in Canada and that he spoke to BUI about on March 28, 2006. HA has

learned the price of the pills will be $3.50 per pill or $3,500.00 for a thousand, which he and BUI

seem to think is too high.

30.     On April 11, 2006, at approximately 7:22 p.m., telephone number 619-335-7037

called a male known as Tam LNU. Tam asked, "What's up Chi?" BUI replied, "Mother fuck,

don't talk about the merchandise, it's all gone. I'm almost run out of it. There are only a few

pills left." Tam LNU replied, " Oh yeah. Let me call Tony." Agents interpret this call to mean

that BUI is almost out of ecstasy pills and cannot supply the ecstasy pill needs of Tam LNU. Tam

000087

LNU indicated that he will call another source of supply known as "Tony." On April 18, 2006, at

approximately 1:50 p.m., telephone number 619-335-7037 called TRUONG. TRUONG stated,

"Something is the matter with you down there, correct? I went down there all the time. You have

been avoiding me." **BUI** replied, "No, nothing is the matter ... It's just that I have been busy

gambling...." TRUONG replied, "It's a long way for me to go down there. Every time I went

down, you always tried to avoid me. Why is that?" Agents are aware through previous intercepts

that TRUONG has been trying to meet, in person, with **BUI** to discuss a large ecstasy pill

transaction However, **BUI** has continually ignored TRUONG's request to meet. TRUONG

stated, "It was imperative that I had to ask for someone else to help because you were not there.

At the moment I only do real estate. Also...before you bought the car, I told you not to buy the

car at this moment...because I have so many things for you to do...to invest right now...." Agents

interpret this call to mean that TRUONG utilized someone other than **BUI** to help traffic his

ecstasy pills because **BUI** did not make himself available to TRUONG. San Diego DEA agents

believe that the term "real estate" is TRUONG's code word for ecstasy pills. San Diego DEA

agents, indicated this because agents are not aware of any real estate business in which TRUONG

is involved. TRUONG stated, "Yeah. I don't know what happened to you...I was very

surprised...and then...there was a problem with the friend (CW-1) you sent up here. It's not that

your friend (CW-1) was a problem...but his uncle (CW#2) was the problem. Yeah...he (CW#2)

said he would earn two bucks this time going up here. If he earned two bucks...just think about

it...if you earned two bucks and he earned two bucks...how much you think it would add up to?

Almost six bucks...and he was willing to take it. So who do you think he is?" **BUI** replied, "But

this guy (CW#1)...he has been doing business with us for some time now...you remember?"

TRUONG replied, "But the problem was that he brought his uncle (CW#2) in." **BUI** replied,

"Uh...I had no idea about his uncle (CW#2)...I told you I trusted this guy...." TRUONG replied,

1   "Amid the commotion of buying and selling, we didn't know who the middleman was. And his

2   uncle (CW#2) wanted to buy at such a high price. You think he was stupid or what? Agents

3   interpret this to mean that TRUONG does not trust CW#2, who was introduced to him by CW#1

4   on March 2, 2006. TRUONG felt that CW#2 was willing to pay too high of a price for ecstasy

5   pills from TRUONG, thus raising TRUONG's suspicion. **BUI** replied, "Uh...hey brother

6
7   Ty...remember that one time you asked me about those soft drinks?" TRUONG replied, " Yeah?

8   Let me call you back in a while." Agents interpret this to mean that TRUONG previously asked

9   **BUI** if he had a source for a large purchase of ecstasy pills which **BUI** refers to as "soft drinks".

10
11  31.      On April 18, 2006, at approximately 3:35 p.m., TRUONG called 619-335-7037.

12  TRUONG asked **BUI**, "What kind of number that he dropped off for you?" **BUI** replied, "Well,

13  he just talked about a general number...." TRUONG replied, "No, can't be a general number if

14  he's serious about doing business with me...whatever he says, tell him to give me a number."

15  **BUI** replied, "Okay. Let me meet with him tonight and I'll tell him that he has to be serious...and

16
17  he would have to have an exact number." TRUONG replied, "I can push a lot." **BUI** asked,

18  "Okay. How many can you push each time? About a thousand?" TRUONG replied, " Very

19  possible." **BUI** replied, "Let me talk to him. He told me that if I took a large quantity...he

20  would...you know?" TRUONG replied, "You know very well that I am...so you don't have to

21  ask that kind of question. It's because when I take the goods, I want that there's nothing left on

22  the market. Gather all the information for me. What color, what brand. Give me all of that.

23
24  What kind of number. Okay?" Agents interpret this call to mean that TRUONG is aware that

25  **BUI** has an ecstasy pill source of supply that can provide large quantities of ecstasy pills and

26
27  TRUONG wants **BUI** to get an exact price of the pills if he buys in large quantities. Agents

28  believe the reference to the purchase of "a thousand" by **BUI** does not mean one thousand pills

21

but means one thousand "boats" of ecstasy, which is the equivalent of one million ecstasy pills. This is supported by TRUONG's statement that when he makes a purchase, he wants to make sure "there's nothing left on the market." Additionally, before making a purchase, TRUONG also wanted BUI to find out the color of the ecstasy pills and logo on the pills. TRUONG and BUI also discussed BUI's plans to purchase a new Mercedes. TRUONG asked, "How much are you gonna put down?" BUI replied, "Maybe about forty thousand." TRUONG replied, "Okay. Well...let's see what happen...and before you pick up the car...before you pay the down payment...we might need the money for the business...and we'll take care of the payment eventually." Agents believe TRUONG wanted to have access to as much cash as possible for the large ecstasy pill purchase he asked BUI to arrange. BUI told TRUONG that he would be meeting with the source of supply later in the evening. Later that evening, several calls were intercepted between BUI and HA arranging to meet. HA had previously told BUI, during intercepted calls, noted above, that he has access to 300,000 ecstasy pills. Agents later surveilled BUI and HA at a coffee shop named Di Vang II, located in Orange County. The agents observed BUI and HA leave the coffee shop and enter BUI's vehicle. BUI dropped HA off at his residence and the surveillance was concluded. Based on the calls and subsequent surveillance, I believe that HA is the source of supply with whom BUI is negotiating TRUONG's large-scale ecstasy pill purchase.

32.    As previously indicated BAILEY is the user of telephone number 619-245-5552. Evidence gathered via intercepted communications over telephone number 619-245-5552 has confirmed that BAILEY had been involved in ecstasy trafficking in the San Diego area. Set forth immediately below, are pertinent intercepted calls from telephone number 619-245-5552

33.    On March 23, 2006, at approximately 7:51 p.m., telephone number 619-245-5552 called

000090

Linh Phuc NGUYEN. BAILEY asked, "Hey...the stuff you gave me last time..." **Linh Phuc NGUYEN** interjected, "Yeah...what about it?" BAILEY stated, "Fuck! You know how much fucking short in there? Fuck! There were two hundred and twenty seven pills short. Huh?" **Linh Phuc NGUYEN** replied, "What was the total?" BAILEY stated, "There were only 773 pills in there. Fuck! What kind of counting those fuckers did?" Agents interpret this call to mean that BAILEY recently purchased one thousand ecstasy pills from **Linh Phuc NGUYEN** and was shorted two hundred and twenty seven pills.

34.    On March 24, 2006, at approximately 6:16 p.m., telephone number 619-245-5552 called **Linh Phuc NGUYEN**. **Linh Phuc NGUYEN** stated, "Um...that fucker...he has it...you don't want to buy it from him?" BAILEY replied, "Buy what? What does he have? Fuck! Who the fuck is going to buy from him at four bucks?" Agents interpret this to mean that BAILEY is not willing to pay four dollars per ecstasy pill from the supplier **Linh Phuc NGUYEN** is referencing. **Linh Phuc NGUYEN** replied, "Well he asked me...Anyway, how much do you usually pay?" BAILEY replied, "Fuck! Three and a half would be max, Long. I've been buying from that fucker Linh (**Linh Phuc Nguyen**), you know..." **Linh Phuc NGUYEN** replied, "Linh?" BAILEY replied, "At three and a half." BAILEY replied, "Yeah. Linh also flew to San Jose to pick up the goods quite a bit. If you buy five or ten boats they will sell it to you at... If you buy ten boats they will sell it to you at two bucks a piece. I have a friend up there..." Agents interpret this call to mean that **Linh Phuc NGUYEN** has recently traveled to San Jose and acquired several thousand ecstasy pills and BAILEY has been purchasing the pills **Linh Phuc NGUYEN** acquired in San Jose.

35.    On March 27, 2006, at approximately 2:44 p.m., telephone number 619-245-5552

23

1 received a telephone call from a female identified only as "Linh" LNU. "Linh" LNU stated, "I

2 need ten boats right now. I just wanted to ask if you have any hook up?" BAILEY replied, "No,

3 it's hard to get now." "Linh" LNU replied, "I know a place where to get it but I don't have

4 enough fund to pay up front." BAILEY replied, "The players are all scared now." "Linh" LNU

5 replied, "No...I have someone who's placed an order with me. I just need the fund to pay for it

6 and then sell it real fast but I don't have enough." BAILEY replied, "Ten of them would cost

7 about twenty thousand. That's too much. You should not call me. I'm hot right now. That's why

8 I don't touch that shit." Agents interpret this call to mean that an acquaintance of BAILEY's

9

10 would like to purchase ten thousand ecstasy pills from him, however, BAILEY does not appear

11 to trust the customer and denies being able to acquire the pills despite the fact that other

12 intercepted calls indicate BAILEY is still actively trafficking ecstasy pills and has sources of

13

14 supply that can acquire large quantities for him.

15 36.     On March 27, 2006, at approximately 7:23 p.m., telephone number 619-245-5552 called

16 Riverside County District Attorney Investigator Mike Galavan. Agents are aware that BAILEY

17

18 has provided information to Investigator Galavan regarding narcotics trafficking and crimes of

19 violence on previous occasions. BAILEY and Investigator Galavan talked about several

20 associates of BAILEY's who are currently in custody on non-drug related crimes. BAILEY told

21

22 Investigator Galavan that **Linh Phuc NGUYEN** is currently trafficking in ecstasy. BAILEY

23 reassured Investigator Galavan that he was not personally involved in any criminal activity.

24 BAILEY stated, "Linh playing hot right now, man." Investigator Galavan asked, "Who?"

25 BAILEY replied, "Linh. The guy I think you caught him before." Investigator Galavan replied,

26 "The guy with the scar on his head?" BAILEY replied, "Yeah. He's rolling down in S.D. (San

27 Diego). He has some people working for him right now." Investigator Galavan asked, "You

28 talking about **Linh NGUYEN**?" His current residential address is 4259 36th Street #7, San

24

000092

Diego, California. replied, "He got arrested not too long ago. Couple years or something. I
think with a boat and a gun. Shit, he move like...I know, I know what he do. He went to supplier
in San Jose. And then get five boats rent a car and drive back to S.D." Agents interpret this call
to mean that his current residential address is 4259 36th Street #7, San Diego, California. is
aware that **Linh Phuc NGUYEN** has recently traveled to San Jose, California, purchased five
thousand ecstasy pills, and drove them back to San Diego for distribution. As he was ending his
conversation with Investigator Galavan, BAILEY received a call on call waiting. BAILEY
ended the conversation with Investigator Galavan and began a conversation with a male
identified only as "Charlie" on the other line. "Charlie" said, "Yeah, what's up man?" BAILEY
replied, "What's up...what's up...hey...maybe tomorrow...or the day after I'd need one unit from
you." Agents are aware from previous intercepts that the term "unit" is in reference to a "boat" of
ecstasy pills which is one thousand pills. "Charlie" replied, "I don't have any right now. Maybe
in a few days." BAILEY replied, "Yeah...get it...get it for me man." Agents interpret this call to
mean that "Charlie" is a source of supply for ecstasy pills for BAILEY and he wants "Charlie" to
supply him with one thousand pills or one "unit".

37.    On March 31, 2006, at approximately 7:37 p.m., telephone number 619-245-5552
called an unidentified male (UM) at telephone number (619)708-7473. UM asked, "What's up
dude?" BAILEY replied, "Shit! I got like 400." UM asked, "I see. When are you gonna need the
change?" BAILEY replied, "As soon as possible." UM asked, "How many did you pick up?"
BAILEY replied, "He don't make it...fucking...his partner shoot that shit out. So this fool...he got
like two boats right? And I pick up one from here...just a couple of hours ago. So I get some
more money I get the other one from him. He got two 'RB.' The name is 'RB.'" UM asked, "R
and B?" BAILEY replied, "Yeah with a triple blue. I shoot out six hundred already. I got like
four hundred left." Agents interpret this call to mean that BAILEY has acquired one thousand

25

000093

ecstasy pills and is informing a customer that he has pills for sale. BAILEY informed the customer of the logo on the pill,"R&B," the color of the pill, blue, as well as the size of the pill, which is triple stack. Triple stack describes an ecstasy pill that is three times the size of a normal pill.

38.    On April 1, 2006, at approximately 8:41 p.m., telephone number 619-245-5552 called an unidentified male (UM) at telephone number (619)251-8202. BAILEY asked, When do you want to meet me?" UM replied, "Could be about an hour." BAILEY replied, "Alright. How much do you need?" UM replied, "Uh just another fifty." Agents interpret this conversation to mean that an ecstasy pill customer of BAILEY's wants to meet him to purchase fifty pills.

39.    On April 2, 2006, at approximately 2:47 p.m., telephone number 619-245-5552 called an unidentified male (UM). BAILEY stated, "I try to dump...I have three hundred pills left, right? I got to dump for four fifty." UM replied, "Alright baby I'll come." Agents interpret this call to mean that BAILEY wants UM to purchase the final three hundred ecstasy pills that he has left.

40.    On April 7, 2006, at approximately 5:39 p.m., telephone number 619-245-5552 called a male identified as Ba TAM. TAM asked, "So your business is doing okay, huh?" BAILEY replied, "Just consider. If I pushed only five of those a month. I would have made two grand and a half on each. Ba TAM replied, "Yes, that's very good." BAILEY replied, "I have been doing like that for more than two years. But I spent it all. I was in Houston last November...Fuck! I was gone for two weeks and took home one hundred and five grand." Ba TAM replied, "That's excellent." Agents interpret this to mean that BAILEY has been trafficking five thousand ecstasy pills a month for the past two years to particular customers. BAILEY admits profiting two thousand five hundred dollars on each one thousand pill sale of ecstasy. BAILEY admits earning one hundred and five thousand dollars on a large ecstasy deal that took place in Houston, Texas

26

000094

in 2005. BAILEY replied, "Mother fuck! I spent money like there was no tomorrow...then I had some forty thousand left, I put it in the nail shop. All that would have been gone if hadn't done that." Ba TAM asked, "How many pills are in each?" BAILEY replied, "One thousand pills." BAILEY replied, "I hit this guy once, a guy whom I used to teach the way around...I was supposed to earn a profit of twenty thousand...no, just seventeen thousand five hundred for that trip. That was my profit for selling over cost just twenty five cents a piece. I bought seventy batches...For seventy batches I would make seventeen thousand five hundred. But fuck! He made me fly back and forth five, six times...cost be four, five thousand dollars...Once it was a done deal, I took the merchandise, sold it and then performed the vanishing act. There was nothing he could do. Another guy and I split the proceeds...Shit! Each if us took one hundred five thousand dollars. That was it! Nothing that guy could do! If he runs into me and wants to shoot me go right ahead." Agents interpret this to mean that BAILEY and an unknown male agreed to transport seventy thousand (batches) ecstasy pills to Houston for a transaction arranged by the supplier for whom BAILEY was working. BAILEY was irritated because the supplier had him fly to Houston several times as the transaction was being negotiated and paid for the trips out of his own pocket. BAILEY went through with the transaction, but after he was paid BAILEY and the other male took the money and did not return it to the supplier. Based on the amount of money that BAILEY said he split with the other male, $210,000 ($105,000 each) agents believe the seventy thousand ecstasy pills were sold by BAILEY for three thousand dollars per boat (one thousand pills). BAILEY indicates that he spent the money rapidly, but purchased a nail salon with the remaining forty thousand dollars.

41.    On April 14, 2006, at approximately 12:29 p.m., telephone number 619-245-5552 called 619-980-7716. BAILEY asked Linh Phuc NGUYEN, "Do you have...mother fuck...two or three hundred pieces?" NGUYEN replied, "When do you want it?" BAILEY replied, "I'll

27

1    meet you like around three o'clock." Agents interpret this call to mean that BAILEY wants

2    NGUYEN to provide him with three hundred ecstasy pills later in the day.

3

4

5    42.     **Linh Phuc NGUYEN** is the user of telephone number 619-980-7716, via which he

6    made numerous narcotics-related calls, described in this and my previous affidavits.  Through

7    these calls, it has been established that **Linh Phuc NGUYEN** is a customer of **BUI,** as well as a

8    supplier of ecstasy for BAILEY and others unknown.  According to an intercepted call between

9    BAILEY and an unidentified associate, noted above, **Linh Phuc NGUYEN** recently traveled to

10   San Jose, California to acquire large amounts of ecstasy pills for distribution in San Diego,

11

12   California.

13                          V. CURRENT INVESTIGATION

14   43.     This application is based in part on intercepted calls made to and from telephone

15   number, 619-980-7716, during the period of April 25, 2006 through May 24, 2006, pursuant to

16   a Title III wiretap order singed by the Honorable Marilyn L. Huff, United States District Judge

17   for the Southern District of California, on April 25, 2006.  The intercepted telephone call

18   involved a discussion with telephone number 619-980-7716  **(Linh Phuc NGUYEN)** and

19   **Target Telephone #1.**  On May 18, 2006, at approximately 8:01 p.m., San Diego agents

20

21   intercepted a call between **Linh Punc NGUYEN** and **Target Telephone #1.**  The speaker of

22   **Target Telephone #1,** who is believed to be **Nam Hoang NGUYEN,**  had a conversation with

23   **Linh NGUYEN** discussing marijuana connections and ecstacy.   This investigation involves the

24   activities of **Target Telephone #1 (Nam Hoang NGUYEN), Linh Phuc NGUYEN, BUI,** and

25

26   others not yet identified.

27

28   INTERCEPTED TELEPHONE CALL BETWEEN LINH PHUC NGUYEN AND
     TARGET TELEPHONE #1 - NAM HOANG NGUYEN ON MAY 18, 2006.

                                      28

44.     On May 18, 2006, at approximately 8:01 p.m., **Target Telephone #1 Nam Hoang**

NGUYEN,  408-314-6063 called telephone number 619-980-7716 **Linh Phuc NGUYEN.** Nam

stated, "oh but anyway....didn't you say you had a connection on some...on that "shit"? Linh

replied, on what "shit"? Nam replied, that "shit"...that "shit, shit"...that "wheel shit". Linh stated,

the Phil Philly "shit"? Nam replied, Nah....that fucking "shit" that you talkin' bout you gonna

sell...you....you got your license for that "shit". Linh replied, oh...oh yeah...yeah... Nam stated,

you talking bout...don't you have a connection on some good "shit"? Linh replied, yeah. Nam

asked, how much is your connection? Linh stated, I have a license dude. Nam replied, Nah-

uh....but how much is your connection on some good "shit"? Linh replied, Uh...in the future.

Nam stated, Nah-uh...fuck the future shit!!! I'm talking about now. I'm trying to

make...damn...I'm trying to make your ass some money now!! Linh replied, from three (3)

[STUTTERS]...to thirty (30) to thirty-five(35). Nam asked, thirty (30) to thirty-five (35)? You

gotta let me know what it is. I mean...is it thirty (30) or thirty-five (35)? Linh replied, Oh. Nam

stated, that's a big difference dude... Linh replied, it's both...that's two (2) different people right

there. Nam responded, Nah-uh...but I'm talkin about some good "shit" though right? Linh

replied, Yeah. That's two (2) different people right there. Nam stated, talkin about some good

good "shit" though? Linh replied, Yeah. Yeah. It suppose to go for forty-six (46). Nam replied,

Oh yeah. Linh stated, Yeah, its suppose to...but because he...he know the person...so it's like

thirty-five (35) or thirty-six (36). And the other one is... [VOICES OVERLAP] Nam stated,

thirty-five (35) or thirty-six (36) is still a lot. I got a connection for thirty (30) for you. Linh

replied, thirty (30)....flat? Nam stated, "Flat". For some good "shit"!!! Linh stated, oh. Hey we

can deal with that. Nam stated, anyway... what happened to the "movie"?... What's up with the

"movie"? Linh replied, its been cool...it's been good. Nam stated, I mean I got...I got "shit" for

29

that...for you too...what's up!! Linh replied, no...nah-uh...I got like.... [VOICES OVERLAP]

Nam stated, I'm talkin about....listen....this is some good "shit". Linh replied, oh I don't know.

Nam stated, I'm talking about new "release"....that...EVERYBODY is waiting in line like that....

Linh stated, what's the name of the movie. Nam replied, that "red devil". Linh stated, I don't

know. I ain't ever heard of it. Nam replied, but you ain't gotta hear it. Linh replied, oh. How

many...how many this...is it "double"? Nam stated, Nah-uh...he got "double"...he got

whatever...I don't know...but they got that...that "movie"...you watched before. Linh stated,

oh...which one? Nam stated, that...that Blue Dolphin. That good "shit". Linh replied,

Oh....Nah... Nam stated, got the "movie". Linh replied, I don't know. Well...I already...I already

rented a "movie" today so... Nam stated, yeah? Linh stated, I don't know...we'll see. No but the

other...the other stuff...the other...the thirty (30) you talkin about...I might...think about it.   Nam

replied, Yeah. Alright. Let me...let me go in there and talk to dad nigga... Linh stated, alright I'll

talk to you later. Alright... Nam stated, he keeps asking about your ass. Linh stated, bye. Nam

replied, bye. [END OF CALL].   Agents interpreted this call to mean that **Nam Hoang**

**NGUYEN** and **Linh Phuc NGUYEN** were discussing the quality and price for marijuana that is

being portrayed has being medical marijuana. **Nam Hoang NGUYEN** indicated he could get

marijuana for a cheaper price then could **Linh Phuc NGUYEN**.   **Nam Hoang NGUYEN** and

**Linh Phuc NGUYEN** then discussed two (2) different types of MDMA (ecstasy) tablets to

include "the red devil" and "the blue dolphin". Nam NGUYEN and Linh NGUYEN also

discussed whether **Linh Phuc NGUYEN** needed any MDMA (ecstacy) at this time. **Nam Hoang**

**NGUYEN** indicated he had a source for a "new release" which people are looking to purchase.

Agents interpret the "new release" to be a new MDMA (ecstacy) tablet.

MAY 26, 2006, SURVEILLANCE OF NAM HOANG NGUYEN AND RUSE CALL TO

TARGET TELEPHONE #1

000098

45.     On May 26, 2006, at approximately 8:00 a.m., agents set up surveillance at 2841 Agua Vista Drive, San Jose, California. At approximately 8:34 a.m., I observed a white Lincoln passenger car bearing California license plate 5PCJ148 pull up to the front of the residence at 2841 Agua Vista Drive, San Jose, Ca. I then observed **Nam Hoang NGUYEN** exit the residence wearing black plants and a blue button up shirt. **NGUYEN** entered the white Lincoln through the passenger door. The Lincoln then drove away from the residence. At approximately 8:44 a.m., agents followed **NGUYEN** to highway 680 South where the Lincoln took the King Road exit off of 680 South in San Jose, Ca. The Lincoln stopped at a red light at the off ramp of 680 South and King Road. At this time, I was directly behind the white Lincoln and SA Adams was next to the passenger side of the Lincoln where **NGUYEN** was sitting at the red light. (Note: the Lincoln did not have tinted windows and both SA Tom Adams and myself had an unobstructed view of **NGUYEN** who was sitting in the passenger seat of the Lincoln). At this time, I placed a ruse call to **Nam NGUYEN**'s cellular phone (408-314-6063). SA Tom Adams and myself both observed **NGUYEN** answer his phone at the same time I placed the call. I asked for "Jose" when **NGUYEN** answered his cellular phone. I was informed by **NGUYEN** that I had the wrong number. When the call was terminated, I observed **NGUYEN** take the phone from his ear and lowered the phone out of my view indicating the **NGUYEN** had disconnected the phone. This ruse telephone call confirmed that Nam NGUYEN is utilizing **Target Telephone #1**.

52.     Agents continued to follow **NGUYEN** to a café and eventually to **NGUYEN's** place of employment, C & K Furniture, located in Milpitas, California. At approximately 10:15 a.m., surveillance was terminated.

PEN REGISTER/TOLL ANALYSIS OF TARGET TELEPHONE #1

31

000099

46.     On May 22, 2006, an Application for a Pen Register (which is also known as a dialed number recorder or DNR or a trap and trace device, was submitted for **Target Telephone #1** and signed by the Honorable Richard Seeborg, United States Magistrate Judge, Northern District of California. On May 25, 2006 a pen register and trap device (hereinafter referred to as "pen/trap device) was activated on **Target Telephone #1**. On July 17, 2006, this same Pen Register was renewed by Magistrate Judge Patricia Trumbull.

47.     On May 19, 2006, a Department of Justice/Drug Enforcement Administration Subpoena was sent to Verizon Wireless requesting toll information for the period of (30 day billing cycle) from April 20, 2006 through May 19, 2006 for **Target Telephone #1**. On or about May 22, 2006, Special Agent Tom Adams received the requested information. A review of these records and others obtained following a subsequent subpoena for subscriber information along with pen register information for numbers called by **Target Telephone #1 (408-314-6063)**, revealed the following:

48.     Between May 20, 2006 and August 16, 2006, **Target Telephone #1** was in contact with telephone number 619-980-7716, subscribed to **Linh Phuc NGUYEN**, approximately two hundred twelve (212) times, with the last call being made on August 14, 2006. **Linh Phuc NGUYEN** has been identified has a MDMA (ecstasy) trafficker in the San Diego, California area by San Diego DEA agents. **Linh Phuc NGUYEN** has utilized his cellular phone on many occasions to facilitate narcotic related transactions based on a San Diego Title III investigation. San Diego DEA agents intercepted a telephone call that indicated **Linh Phuc NGUYEN** recently traveled to San Jose, California to acquire large amounts of ecstasy tablets for distribution in the San Diego, California area. January 2006, San Diego DEA agents observed **Linh Phuc NGUYEN** involved in a transaction involving one thousand Ecstasy tablets. In

32

1   March 2003, **Linh Phuc NGUYEN** was arrested with two associates after they sold three-

2   thousand (3000) Ecstasy pills to an undercover DEA Undercover Agent. **Linh Phuc**

3   **NGUYEN** was armed at the time of his arrest with a stolen 9mm handgun. Agents believe that

4   **Nam NGUYEN**, subscriber of **Target Telephone #1** is the Source of Supply for **Linh Phuc**

5   **NGUYEN.**

6

7   49.    Between May 20, 2006 and August 16, 2006 **Target Telephone#1** was in contact with

8   telephone number 619-283-5871 one (1) time, with the last call being made on August 4, 2006.

9   This number was listed as a home phone number on the above listed subject **Linh Phuc**

10  **NGUYEN's** T-Mobile account #403915260 for cellular telephone number 619-283-5871.

11

12  50.    Between May 20, 2006 and August 16, 2006, **Target Telephone#1** was in contact with

13  telephone number 619-519-2086 three (3) times with the last call being made on August 1,

14  2006. Telephone number 619-519-2086, is subscribed to **Thuan NGUYEN**, 4278 47th ST.

15  Apt.#4 San Diego, CA, 92115. This number is associated with a current DEA Title III San

16  Diego OCEDTF investigation involving an Ecstacy Drug Trafficking Organization.

17

18  51.    Between May 20, 2006 and August 16, 2006, **Target Telephone#1** was in contact with

19  602-481-8978 four (4) times with the last call being made on August 10, 2006. Telephone

20  number 602-481-8978 is subscribed to Suzen Tang, 43250 W Lindgren Drive, Maricopa,

21  Arizona, 85239. The number 602-481-8978 is also associated with a current San Diego DEA

22  Title III Ecstasy case.

23

24  52.    Between May 20, 2006 and August 16,, 2006, **Target Telephone #1** was in contact with

25  telephone number 408-316-6574 fifty-nine (59) times, with the last call being made on August

26  14, 2006. Telephone number 408-316-6574, is subscribed to **Nam Hoang NGUYEN**, 2841

27  Agua Vista Drive, San Jose, California. This is noteworthy because **Target Telephone #1** is

28

also subscribed to **Nam Hoang NGUYEN** who is the listed subscriber of **Target Telephone #1.**

53.    The information provided in the above pen register and toll information sections is not an all-inclusive list of numbers identified by your Affiant as telephone numbers contacted by **Target Telephone#1**. As a result of the telephone toll analysis review conducted on **Target Telephone#1**, your Affiant has identified numerous telephone calls made by **Target Telephone #1** to prepaid cellular telephones and cellular telephones. Based on your Affiant's training and experience, those individuals participating in narcotics distribution and money laundering activities use, as their primary means of communication, devices that **are** difficult to trace back to the user, such as pagers, coin operated telephones, prepaid cellular telephones subscribed with fictitious names and cellular telephones subscribed with fictitious names. Your Affiant believes that the interception of wire communication over **Target Telephone #1** will enable agents to obtain essential information regarding **Nam Hoang NGUYEN**, and his associates who are distributing ecstasy and monies through unknown means in the San Jose, California, area and elsewhere.

54.    Based on your Affiant's training and experience and on the facts as described in this affidavit, your Affiant believes that **Nam Hoang NGUYEN** and the named possible interceptees utilize **Target Telephone #1** for their drug distribution and attempts to evade law enforcement authorities.

55.    Therefore, it is your Affiant's belief that the interception of wire communications conducted over **Target Telephone #1** is one of the best techniques with a reasonable likelihood of securing the evidence necessary to prove beyond a reasonable doubt that the named possible interceptees, and others known and unknown, are engaged in the above described offenses. Although a great deal of evidence had been obtained against some members of this drug

34

000102

trafficking organization, agents are attempting to gain additional evidence to successfully

identify, arrest, and prosecute the principal members of this organization and their associates in

order to dismantle this entire communication.

## VI.  INTERCEPTION OF WIRE COMMUNICATIONS

56.    It is my opinion that the roles of the members in sophisticated drug-trafficking

organizations are compartmentalized and that the leaders and managers usually oversee and

direct those below them by means of wire communications such as cellular telephones or by

meetings that frequently take place in areas that are difficult for surveillance.

Identifying all of the leaders and members of the organization in their respective roles and

participation and the facilitation of the organization's narcotic trafficking is unlikely without the

use of wire interception to identify not only the leaders of the organization, but also how the

organization is structured and operates.

## VII.  NEED FOR INTERCEPTION OF WIRE COMMUNICATIONS

57.    Thus far, the investigation has revealed information, including that **Nam Hoang**

**NGUYEN** is an ecstasy supplier for the San Diego, California area and uses **Target Telephone**

**#1** to coordinate his drug trafficking activities.

58.    As discussed in detail below, law enforcement has tried traditional investigative

techniques  however, these techniques have failed to meet all the goals of this investigation.

Traditional investigative techniques have been tried and have failed to achieve the objectives of

this investigation, namely, to identify all those involved in this ongoing 3, 4

methylenedioxymethamphetamine (MDMA) and marijuana trafficking organization, including

buyers, and particularly the person(s) importing the 3,4 methylenedioxymethamphetamine

(MDMA) and marijuana.  The investigation has thus far failed to identify the location(s) where

3,4 methylenedioxymethamphetamine (MDMA) and marijuana is now being transported and

000103

stored; identify the location(s) where money and other assets acquired from the 3, 4

methylenedioxymethamphetamine (MDMA) and marijuana trafficking activities may be

located; and develop sufficient evidence to prosecute those who continue to carry out this

conspiracy. Additional efforts to employ normal investigative techniques appear unlikely to

succeed in the future, too dangerous to employ, or unlikely to reveal the identities and roles of

all those involved, the full scope of the conspiracy, and the location of all contraband and illicit

proceeds acquired as a result of the conspirators' illegal drug trafficking activities. In short, the

investigation has failed, and traditional techniques have failed, or reasonably appear too

dangerous to try, to achieve the goals of this investigation including:

a. The manner, scope and extent that the TARGET TELEPHONE is being used to

facilitate the above offenses, which supports the existence of a conspiracy and which provides

evidence of the identities and roles of the TARGET SUBJECT, co-conspirators, and the precise

nature and scope of their illegal activities;

b. The identities of co-conspirators, accomplices, and aiders and abetters of the

conspiracy, including the leaders of the organization in San Jose, California and elsewhere, and

all sources of supply;

c. The distribution network used by the TARGET SUBJECT and his co-conspirators,

including the method by which they transport heroin into the United States and then from the

stash locations, and distribution locations, the manner and method by which the narcotic

substances are packaged and/or concealed, and the catalog of names and locations of criminal

participants from the first point of manufacture to the street delivery of ecstasy;

d. The dates, times, places, schemes, and methods used by the TARGET SUBJECT and

co-conspirators for manufacturing, selling, buying, possessing, concealing, transporting and

distributing ecstasy;

36

e. The dates, times, places, schemes, and methods used by the TARGET SUBJECT and co-conspirators for disposing of the proceeds derived from the trafficking of ecstasy;

f. The location of stash houses, and sites used by the TARGET SUBJECT and associates, accomplices and co-conspirators to manufacture ecstasy and other controlled substances;

g. The location of financiers, managers and supervisors of the ecstasy manufacturing and distribution operation;

h. The existence and location of the books and records, computer disks, ledgers, telephone address books, telephone answering devices, photographs, video tapes, cassette tapes, and all other documents relating to the above offenses;

I. The methods by which the illicit proceeds are transported from the distribution areas to their final destination;

j. The identity and location of assets, which may be subject to seizure or forfeiture, which have been accumulated by the TARGET SUBJECT and co-conspirators as a result of their illegal activities;

k. The identity of the communication facilities including residential telephones, business telephones, pay telephones, fax machines, computer communications systems, voice mail systems, digital pagers and/or cellular telephones commonly used by the TARGET SUBJECT and associates, accomplices and co-conspirators to facilitate the activities described herein;

l. The location and disposition of the proceeds from the above activities; and

m. Admissible evidence of the commission of the above offenses and proof beyond a reasonable doubt of the intent of each of the participants to join and participate in the conspiracy

000105

1    knowingly and willingly.

2                          CONFIDENTIAL SOURCES

3    58.    Law enforcement has not used any CSs in this specific investigation of the **Nam Hoang**
4
5    **NGUYEN** drug-trafficking organization. Law enforcement does not know of any CSs who can

6    provide information about or infiltrate this organization. Although San Diego DEA agents

7    utilized confidential sources in their investigation, no confidential sources are known to law

8    enforcement who can infiltrate the **Nam Hoang NGUYEN** drug trafficking organization.
9
10   59.    Law enforcement in this case has made queried both the WISN (Western States

11   Information Network) computer database as well as the LA CLEAR computer database. Both

12   databases are de-confliction databases containing information related to state, local and federal

13   investigations. **Nam Hoang NGUYEN** did not appear in either database. Accordingly, no
14
     prospective CS's appear to exist at this time.
15
16   60.    Of course, if, in the future, law enforcement finds a CS who is reliable and willing and

17   can provide information or infiltrate **Nam Hoang NGUYEN's** organization, law enforcement

18   will use the CS to the full extent that it is safely possible.

19   61.    Nevertheless, I do not believe that CSs will be able to achieve all the goals of the
20
21   investigation. Based on my training and experience, I know that narcotics traffickers use many

22   tactics to minimize law enforcement detection, and to protect themselves, their sources of

23   supply, and their customers from criminal competitors. Drug traffickers commonly treat new

24   customers with distrust and are secretive, even deceptive, with them about their sources of
25
26   supply,

27   employees or other customers. Therefore, the necessary level of trust is rarely reached by a CS.

28   Also, in my experience, and in the experience of other law enforcement personnel with whom I

                                              38

have spoken, drug traffickers are aware that an effective and common investigative technique is the use of cooperating sources to negotiate and complete drug purchases from them. Thus, while CSs may be an invaluable investigative resource, it is often difficult or impossible to find CSs, who are able to infiltrate narcotics trafficking organizations and engage in narcotics transactions with them or introduce a UC. Similarly, it is often difficult and dangerous to find persons who are already involved in the organization who are willing and able to cooperate with the government, particularly without jeopardizing the investigation.

62.    Based on my training and experience, it is common for narcotics traffickers to compartmentalize their operations as a means of security against law enforcement investigation, CSs, UCs and cooperating defendants. In many instances, no one person may know the entire scope or activities of an organization or the names, identities and roles of the various members of the criminal organization. Therefore, I believe that it is unlikely that a CS or UC could reasonably achieve all the goals of this investigation because it is unlikely that a CS or UC would be in a position to identify all the co-conspirators, all their sources of supply of illegal narcotics, the sources and distribution of funds, the identification and location of all the assets being accumulated by them, the methods and procedures for the laundering of monetary instruments and to determine all the locations at which they store their controlled substances and to develop proof beyond a reasonable doubt against each member of the conspiracy.

63.    Based on my training and experience, as well as the training and experience of law enforcement agents with whom I have spoken, I believe that CSs will not meet all the goals of this investigation.

// //

// //

39

## UNDERCOVER OFFICERS

64.    Undercover agents have not been utilized in the investigation of **Nam Hoang NGUYEN**, subscriber of **Target Telephone #1**. Law enforcement does not know of any UC who can infiltrate the organization.

65.    Law enforcement cannot successfully introduce a new UC into **Nam Hoang NGUYEN's** organization, for the same reasons, discussed above, that it cannot successfully introduce a new CS. In addition, a CS usually introduces a new UC into an organization. However, in this case, as discussed above, law enforcement does not have a CS who can safely and realistically introduce a UC into the organization.

66.    Drug trafficking organization members awareness of the use of undercover agents causes drug traffickers to be cautious of accepting new members into the illegal drug distribution organization. Organizations of this magnitude do not allow strangers into the upper level. Furthermore, in order to establish an undercover agent sufficient to gain the trust of organizational leaders, this would require criminal acts not allowed by government agents. I believe that there are no undercover agents who are currently in a position to infiltrate the organization sufficiently to identify all key members of the conspiracy, including **Target Telephone #1**, sources of supply of illegal drugs and methods used by the organization to launder drug proceeds to satisfy the chief objectives of this investigation.

67.    If, in the future, law enforcement is able to successfully introduce a new UC into **Nam Hoang NGUYEN's** organization, law enforcement plans to use the UC to the full extent that it is safely possible.

## BUY/BUST OPERATION

68.    The "buy-bust" scenario is an investigative technique that is often used in drug

40

000108

investigations. In this scenario, a person or persons are arrested immediately following the purchase of drugs from them by an undercover agent or a cooperating witness. The arrestees are then enlisted to provide cooperative assistance to the investigating agents by either testifying against fellow co-conspirators or by becoming a cooperating witness themselves in order to build a case against other subjects of the investigation.

This technique can be used effectively in some cases, however, I do not believe it would be successful in this investigation for the following reasons: when investigating agents employ the "buy-bust" technique, they have no assurance that the person or persons arrested will agree to cooperate. Should a buy bust occur involving the drug traffickers within this organization and the arrestee or arrestees refuse to cooperate with law enforcement, the investigation will become compromised. Furthermore, the person or persons arrested often do not have access to all of the subjects of the investigation and are therefore unable to assist in building a case against all the subjects of the investigation. There is no assurance that arresting any known members of this organization, will result in the identification of all members of the organization, much less satisfy the numerous goals of this investigation which are set forth in Section Five of this Affidavit.

70.     Based on my training and experience, as well as the training and experience of law enforcement agents with whom I have spoken, I believe that buy bust will not meet all the goals of the investigation discussed above.

### PHYSICAL SURVEILLANCE

71.     The following physical surveillance(s) have been conducted in the San Jose, CA area during the course of this investigation:

// //

41

000109

MAY 2, 2006, SURVEILLANCE ON 2841 AGUA VISTA DRIVE, SAN JOSE, CA.

72.    On May 2, 2006, at approximately 8:44 a.m. until 2:00 p.m., San Jose DEA agents conducted surveillance on 2841 Agua Vista Drive, San Jose, CA.  This address is believed to be **Nam Hoang NGUYEN's** residence, subscriber of **Target Telephone #1**.  Your affiant has confirmed this based upon a Lexis/Nexus surveillance conducted on this residence.  During the course of the surveillance, agents observed several vehicles arrive and leave the residence.  **Nam Hoang NGUYEN** subscriber of **Target Telephone #1** was never observed during the surveillance.

MAY 19, 2006, SURVEILLANCE ON 2841 AGUA VISTA DRIVE, SAN JOSE, CA

73.    On May 19, 2006, at approximately 12:30 p.m. until 3:00 p.m., San Jose DEA agents conducted surveillance on 2841 Agua Vista Drive, San Jose, Ca .  **Nam Hoang NGUYEN's** vehicle, a 2003 white Chevrolet Tahoe bearing California license plate 5DBX081, was not observed in the driveway of the residence.  I checked two additional addresses associated with NGUYEN but did not observe his vehicle at either location.  Agents never observed **NGUYEN** during the surveillance.

MAY 25, 2006, SPOT CHECK SURVEILLANCE ON 2841 AGUA VISTA DRIVE, SAN JOSE, CA.

74.    On May 25, 2006, at approximately 9:33 a.m., Special Agent (SA) Tom Adams conducted a spot check surveillance at 2841 Agua Vista Drive, San Jose, California.  SA Adams did not observe **Nam Hoang NGUYEN** (subscriber of **Target Telephone #1**) or NGUYEN's vehicle at 2841 Agua Vista Drive, San Jose, CA.  SA Adams did not observe any persons outside the residence or any new or unknown vehicles during the spot check surveillance.

// //

// //

42

1   MAY 31, 2006, SPOT CHECK SURVEILLANCE 2841 AGUA VISTA DRIVE SAN JOSE,
2   CA.

    75.    On May 31, 2006, at approximately 8:47 a.m., Special Agent (SA) Tom Adams
3
    conducted a spot check surveillance at 2841 Agua Vista Drive, San Jose, California.  SA Adams
4
    did not observe **Nam Hoang NGUYEN** (subscriber of **Target Telephone #1**) but did observe
5
6   NGUYEN's  vehicle (white Chevrolet Tahoe CA Plate 5DBX081) parked in the driveway at

7   2841 Agua Vista Drive, San Jose, CA.  SA Adams did not observe any persons outside the

8   residence or any new or unknown vehicles during the spot check surveillance.

9   JUNE 6, 2006 SURVEILLANCE AT 2841 AGUA VISTA DRIVE SAN JOSE, CA.
10
    76.    On June 6, 2006, at approximately 9:30 a.m. until 2:00 p.m., San Jose DEA agents
11
    conducted surveillance on 2841 Agua Vista Drive, San Jose, CA.  During the course of the
12
13  surveillance, agents observed several vehicles arrive and leave the residence.  **Nam Hoang**

14  **NGUYEN** subscriber of **Target Telephone #1** was never observed during the surveillance.

15  JUNE 12, 2006 SPOT CHECK SURVEILLANCE AT 2841 AGUA VISTA DRIVE SAN JOSE
16  CA.

17  77.    On June 12, 2006, at approximately 1:22 p.m., Special Agent (SA) Tom Adams and SA
18
    Pat Donlin conducted a spot check surveillance at 2841 Agua Vista Drive, San Jose, California.
19
    SA Adams did not observe **Nam Hoang NGUYEN** (subscriber of **Target Telephone #1**) but did
20
21  observe NGUYEN's vehicle (white Chevrolet Tahoe CA Plate 5DBX081) parked in the driveway

22  at 2841 Agua Vista Drive, San Jose, CA.  SA Adams did not observe any persons outside the

23  residence or any new or unknown vehicles during the course of the spot check surveillance.

24  JUNE 16, 2006, SURVEILLANCE OF NAM NGUYEN SUBSCRIBER OF TARGET
25  TELEPHONE #1

26  78.    On June 16, 2006 at approximately 9:15 a.m., San Jose DEA agents observed Nam
27
    NGUYEN's vehicle parked in a parking lot near the Thoa Café located at 1040 McLaughlin
28
    Avenue, San Jose, CA.  At approximately 9:45 a.m., agents observed NGUYEN enter his vehicle

                                           43

and exit the Thoa café. Agents followed NGUYEN to a vacant building with a blue awning located on Tully Road, west of the Wells Fargo Bank near the Eastridge Mall in San Jose, California. At approximately 9:50 a.m., SA Morejon observed NGUYEN exit his vehicle, walk up to the vacant building and then walk back to his vehicle. Agents continued to follow NGUYEN to a residence located at 1259 Medley Drive, where at approximately 10:00 a.m., SA Morejon observed NGUYEN walk to the front door. At approximately 10:23 a.m., SA Morejon observed NGUYEN exit the residence and move his vehicle from the driveway to the street and walk back to the residence. A few moments later SA Morejon observed a white SUV (later identified as a white Lexus bearing CA Plate 5PLE525) exit the garage. Agents followed the Lexus to 190 Leavesley, Gilroy, CA. At approximable 11:00 a.m., SA Morejon observed NGUYEN enter and exit the Carniceria El Paraiso located in a strip mall at 150 Leavesley, Gilroy, CA. NGUYEN then walked over to the area where the Lexus SUV was parked.. NGUYEN was followed back Medley Drive and was observed by agents driving away in his vehicle (white chevy Tahoe). Agents then followed NGUYEN to a Wells Fargo Bank located at Capital Square Mall on Capitol Avenue, San Jose, CA. At approximately 12:03 p.m, SA Donlin observed NGUYEN enter the Wells Fargo Bank. At approximately 12:45 p.m., SA Donlin observed NGUYEN walking from the Wells Fargo Bank, get into his vehicle and depart the area. Agents then followed NGUYEN to the CitiBank located on Alum Rock east of Capitol. At approximately 12:50 p.m., SA Adams observed NGUYEN as he pulled into the parking lot. At approximately 12:58 p.m., SA Adams observed NGUYEN get into his vehicle and depart the area. Agents continued to follow NGUYEN to the Grand Century located at 1111 Story Road, San Jose, CA. At approximately 1:14 p.m. SA Adams observed NGUYEN park in front of the United Commercial Bank. At approximately 1:19 p.m., SA Adams observed NGUYEN exit his

44

000112

1  vehicle and walk toward the entrance of the business. SA Morejon observed NGUYEN walk

2  into the entrance of the Grand Century. At approximately 1:55 p.m. SA Morejon observed

3  NGUYEN exit the Grand Century. Agents continued to follow NGUYEN to downtown San

4  Jose, CA where at approximately 2:05 p.m. surveillance was terminated.

5

6  <u>JULY 12, 2006, SPOT CHECK SURVEILLANCE AT 2841 AGUA VISTA DRIVE SAN JOSE, CA.</u>

7  79.    On August 1, 2006, at approximately 9:10 a.m., Special Agent (SA) Tom Adams

8  conducted a spot check surveillance at 2841 Agua Vista Drive, San Jose, California. SA Adams

9  did not observe **Nam Hoang NGUYEN** (subscriber of **Target Telephone #1**) but did observe

10 NGUYEN's vehicle (white Chevrolet Tahoe CA Plate 5DBX081) parked in the driveway at 2841

11 Agua Vista Drive, San Jose, CA. SA Adams did not observe any persons outside the residence

12

13 or any new or unknown vehicles during the spot check surveillance.

14 <u>AUGUST 1, 2006 SPOT CHECK AT 2841 AGUA VISTA DRIVE SAN JOSE, CA.</u>

15 80.    On August 1, 2006, at approximately 9:10 a.m., Special Agent (SA) Tom Adams

16 conducted a spot check surveillance at 2841 Agua Vista Drive, San Jose, California. SA Adams

17

18 did not observe **Nam Hoang NGUYEN** (subscriber of **Target Telephone #1**) but did observe

19 NGUYEN's vehicle (white Chevrolet Tahoe CA Plate 5DBX081) parked in the driveway at 2841

20 Agua Vista Drive, San Jose, CA. SA Adams did not observe any persons outside the residence

21 or any new or unknown vehicles during the spot check surveillance.

22 <u>AUGUST 9, 2006, SURVEILLANCE AT 2841 AGUA VISTA DRIVE SAN JOSE, CA.</u>

23 81.    On August 9, 2006, at approximately 11:15 a.m., your Affiant and SA Tony Guzman

24 conducted surveillance at 2841 Agua Vista Drive, San Jose, California. Agents did not observe

25 **Nam Hoang NGUYEN** (subscriber of **Target Telephone #1**) but did observe NGUYEN's

26

27 vehicle (white Chevrolet Tahoe CA Plate 5DBX081) parked in the driveway at 2841 Agua Vista

28

000113

1    Drive, San Jose, CA. SA Adams did not observe any persons outside the residence or any new

2    or unknown vehicles during the surveillance. At approximately 11:45 a.m., surveillance was

3    terminated.

4

5    84.    Based on my experience, extensive surveillance conducted in controlled substance

6    investigations is often compromised by the subjects of the investigations. Discovery is often the

7    result of the subjects themselves conducting surveillance or counter-surveillance measures

8    designed to detect and avoid law enforcement authorities, competing narcotics organizations, and

9    robbers. The discovery of surveillance by the subjects typically forces the immediate termination

10   of surveillance activities and jeopardizes the entire investigation. Moreover, due to the nature of

11   narcotics organizations, many drug traffickers possess weapons which heighten the danger of

12   

13   surveillance and other investigative techniques that cause agents to be in close proximity to the

14   subjects.

15   85.    As a general matter, I believe that photographic and physical surveillance, alone or in

16   combination, rarely succeeds in gathering sufficient evidence to adequately support a

17   

18   prosecution. More specifically, I believe that such methods would not succeed in an

19   investigation of the geographic magnitude of the investigation into **Nam Hoang NGUYEN or**

20   the speaker of **Target Telephone #1.** Further, physical surveillance can only place people and

21   

22   places together at a specific time. Rarely is enough information gathered to provide evidence

23   sufficient to link all members of an organization to overt acts necessary to achieve convictions.

24   Surveillance alone cannot provide the details that may be gleaned from criminal conversations

25   between individuals involved in illegal activity. Further, surveillance is not expected to enlarge

26   upon information now available. In fact, prolonged or regular surveillance of the movements of

27   suspects would most likely be noticed, causing them to become more cautious in their illegal

28

46

1  activities, to flee in order to avoid further investigation and prosecution, or to otherwise

2  compromise the investigation.

3  86.  Physical surveillance is also unlikely to sufficiently establish the roles of the named

4  conspirators, to identify additional conspirators, or otherwise provide admissible evidence in

5  regard to this investigation, because it is not possible to determine the full nature and scope of the

6  aforementioned offenses by the use of physical surveillance.  Members associated with **Target**

7  **Telephone #1** subscribe to telephone service(s) in the names of others or use fictitious names

8  and addresses, resulting in a veritable "shell game" of their location and identity.  Information

9  that can be developed through physical surveillance is limited to those members of the

10  organization who make themselves vulnerable to physical surveillance, which generally does not

11  include the highly placed individuals of the organization.  Surveillance conducted in conjunction

12

13  with the monitoring of **Target Telephone #1** , will be more effective, insofar as this monitoring

14  may allow the agents to identify targets and anticipate when drug transactions are about to take

15  place and make arrangements for the most productive possible forms of surveillance.  As

16  recently as August 9, 2006, the DEA conducted "spot checks" (physical surveillance) of **Target**

17

18  **Telephone#1's** known residence.

19  87.    Physical surveillance of **Target Telephone #1's** ( residence 2841 Agua Vista Drive, San

20

21  Jose, CA) has been conducted in an effort to identify residences,  suspects and co-conspirators,

22  and identify possible methods of laundering narcotics proceeds.  Thus far, physical surveillance

23  has been unable to verify relationships between suspects.  Physical surveillance has been unable

24  to verify methods of laundering narcotics proceeds or destinations for laundered proceeds.  The

25  current necessity for physical surveillance has subjected the investigation to a greater likelihood

26

27  of being detected and its success jeopardized.  Future traditional visual surveillance may result in

28

47

1    a probable cause arrest, but will not result in evidence substantial enough to dissolve the

2    organization. Therefore, surveillance has been and will continue to be of limited use in this

3    investigation.

4
5    88.    Law enforcement will continue to use surveillance when it appears both safe and

6    reasonably likely to lead to incriminating evidence. However, based on my training and

7    experience, I believe that the risks of continued, frequent and prolonged surveillance may

8    outweigh the benefits. Such surveillance may not be safely and realistically possible. Such

9    surveillance could draw attention to the investigation, causing the suspects to become more

10   cautious in their illegal activities, to flee to avoid further investigation and/or prosecution, or

11   otherwise compromise the investigation. Detection of surveillance could jeopardize this

12   investigation. The risk of detection is heightened.

13
14   89.    Based on my training and experience, I do not believe that surveillance will fulfill all the

15   goals of this investigation. Foremost in my experience, narcotics traffickers typically act in a

16   way designed to conceal the illegal nature of their conduct and are sensitive to the possibility of

17   surveillance and other law enforcement intrusion into their activities. Surveillance can be

18
19   valuable, but generally serves only to corroborate other indications of illegal conduct or provide

20   leads to further the investigation. Unless used in conjunction with other techniques, such as

21   electronic surveillance, physical surveillance is of limited value in establishing proof beyond a

22   reasonable doubt that subjects are engaged in a conspiracy to distribute drugs. Proof would be

23   lacking of the agreement between the targets necessary to demonstrate that otherwise innocent-

24   appearing activities are acts in furtherance of the conspiracy. Additionally, to show the full

25   extent of the perceived conspiracy (to include all the goals and objectives set forth for this

26   investigation) of an organization the size of the **Nam Hoang NGUYEN's** network is unlikely to

27
28

48

1    succeed. But, when physical surveillance is used in conjunction with electronic surveillance, it is

2    more likely that the purpose of meetings and activities and the roles of the identified associates

3    will be more fully understood, and that proof beyond a reasonable doubt can be more easily

4    obtained.

5

6                                          POLE CAMERAS

7    90.    The installation of cameras has been considered by the agents assigned to this

8    investigation and because of the limitations of this surveillance technique agents have decided

9    against it for the following reasons:

10

11            a.    Cameras located in public places provide visual images of one side of a building,

12                  and under the best of conditions can be used to verify the presence of particular

13                  people at particular times.

14            b.    Without the augmentation of telephonic or electronic surveillance, cameras are

15                  reasonably unlikely to determine the nature of conspiratorial activity taking place.

16                  Using cameras without such augmentation would be unlikely to fully identify all

17                  co-conspirators and their roles in the conspiracy. Therefore, the limitations of

18                  normal physical surveillance only apply here as well i.e., little or no information

19

20                  will be obtained concerning the nature of conversations taking place.

21            c.    In addition, weather and light conditions severely affect the usefulness of cameras.

22

23    91.    Your affiant has identified only one residential address associated with **Nam Hoang**

24    **NGUYEN**, 2841 Agua Vista Drive, San Jose, California. During the numerous dates on which

25    surveillance has been conducted at this location, your affiant does not believe that any illegal

26    activities have been observed. Your affiant does not believe that **NGUYEN** conducts business

27    with co-conspirators or other narcotics traffickers at this residence. This residence is located in a

28

                                                49

suburban enclave free from any apparent criminal activities. It does not appear to your affiant, based on my training and experience, that this residence is used as either a "stash" house or to facilitate any of NGUYEN's criminal activities. Therefore, a camera at this location would likely not assist in meeting the goals of this investigation.

92.   Furthermore, pole cameras, even where utilized effectively, are unlikely to establish the nature and scope of Nam Hoang NGUYEN, Chi BUI or Linh Phuc NGUYEN's drug trafficking activities or provide information regarding the likely sources of their ecstacy in the San Jose, San Diego, Orange County or Houston, Texas areas.

93.   In short, further surveillance, without the information from electronic interceptions, carries a high risk of discovery by NGUYEN while yielding a low probability of discovery of additional evidence. Based upon my training and experience, as well as the training and experience of law enforcement agents with whom I have spoken, I believe that surveillance will not meet all the goals of this investigation.

<u>TRACKING DEVICES</u>

94.   Physical surveillance can be aided by using devices such as Global Position System (GPS) trackers. However, such devices can provide only limited data regarding the target's movements, and cannot verify the exact locations or person with whom a target is interacting. Rather, the data would show only general information regarding movements which could neither verify nor refute the criminal nature of any target's activities. Therefore, the use of GPS data-tracker information alone or in combination with surveillance and other investigative techniques discussed in this Affidavit is not sufficient to achieve all of the goals of this investigation, including the identification of all the co-conspirators and proof beyond a reasonable doubt of the nature and extent of the conspiracy.

50

95.    Utilization of a GPS in this case is problematical since we know, based upon the

surveillance conducted in this case, that **Nam Hoang NGUYEN's** vehicle has been observed at

the 2841 Agua Vista Drive residential address and **NGUYEN's** place of employment located at

2655 El Camino Real, Santa Clara, California. Your affiant believes that the benefits inherent in

an attempt to install a GPS on **NGUYEN'S** vehicle at either location are outweighed by safety

concerns and the possibility that agents and this investigation may be discovered by **NGUYEN**

or his associates. The business address, for example, is a large shopping mall complex. The

parking structure is a parking garage. Thus, agents opportunity to install a GPS at this location

without detection is improbable. The same may be generally stated regarding any such attempts

at the residential address. The residence is one that **NGUYEN** appears to share with other

persons who do not appear to be involved in criminal activities. In fact, it appears, based on

surveillance conducted at this location, that a child day-care type facility may be a business that

operates during the day time inside this facility.

96.    In short, I do not believe that a GPS or any other type of tracking device will meet all the

goals of this investigation nor do I believe one is safe and practicable under the current

circumstances of this investigation.

## TRASH SEARCHES

97.    An investigative technique which occasionally provides valuable information is the

collection and examination of discarded trash from a target subject's residence. This technique is

also known as a "trash run". Agents have conducted three (3) trash runs at the related address of

**Target Telephone #1**, but obtained no evidentiary value. On April 21, April 28 and May 26,

2006, agents collected garbage from a trash receptacle that was located in front of the residence

of 2841 Agua Vista Drive, San Jose, California (Note: address of **Nam Hoang NGUYEN**

000119

1    subscriber of **Target Telephone #1**) but did not obtain anything of evidentiary value on any of

2    the above listed garbage collections. Agents noticed that during the acquisition of the trash, the

3    trash receptacles were located in front of the residence which might prove to be an obstacle to

4    successful future covert trash searches at the related residence of **Nam Hoang NGUYEN**

5    (subscriber of **Target Telephone #1**).

6

7    98.    San Diego DEA agents have revealed through the course of their investigation that **Target**

8    **Subject, Chi BUI**, is residing with his sister in a gated community at 9534 Galvin Ave, San

9    Diego, California. after several attempts San Diego DEA agents have not observed **BUI's** trashed

10   placed in front of the residence.   San Diego DEA agents have also identified an address for

11

12   **Target Subject, Linh Phuc NGUYEN**.  Agents have identified 4259 36th St. Apartment #7,

13   San Diego, California as the residence of **Linh Phuc NGUYEN**.   This address is an apartment

14   building that utilizes a common trash dumpster, thereby making it impractical to search. At this

15   time, trash searches alone or conducted along with normal investigative techniques will not help

16   achieve the goals of this investigation for the following reasons:

17

18         a.    The trash search(es) conducted to date have not yielded anything of evidentiary

19               value.

20         b.    The use of further trash searches exposes agents who acquire the trash to safety

21               issues, given that the trash is obtained in a covert manner that could lead to

22

23               possible confrontation with the target(s), their associates, or the public.

24         c.    Further trash searches could jeopardize the investigation of the entire organization

25               should a target, a neighbor, or someone who knows a target observe agents

26               confiscating the trash.

27

28

000120

d.    Obtaining the assistance of city or city contracted employees who collect the trash could compromise the investigation, I do not know whether those employed by the trash collection agency know the targets or other residents in the area or if they could be trusted not to compromise the investigation since they are not law enforcement officers.

e.    Drug traffickers go through great lengths to destroy possible incriminating evidence to include shredding information and frequently will not use their residential trash containers to dispose of valuable information.. Based on my training and experience, and the experience of more senior agents , I know that it is not uncommon for traffickers to carry trash from their residences and place it in commercial dumpsters to avoid having it examined by law enforcement.

99. I do not believe that trash searches, even if conducted in conjunction with conventional methods of investigation, will achieve the numerous goals of this investigation. However, trash searches may be more effective if used in conjunction with wire interception that indicates locations and approximate times that agents can use to conduct such searches.

<u>MAIL COVERS</u>

100. A postal mail cover was initiated on August 2, 2006 on the residence of **Nam Hoang NGUYEN**, subscriber of **Target Telephone #1**, located at 2841 Agua Vista Drive, San Jose, California. To-date, no evidence has been gathered which would assist in meeting the goals of this investigation. Furthermore, San Diego DEA agents have initiated mail covers associated with the **Targets Subjects, Chi BUI** and **Linh Phuc NGUYEN** in San Diego, CA. To date, no evidence has been gathered that would assist agents in the furtherance of this investigation into the **Nam Hoang NGUYEN** ecstacy trafficking organization.

53

000121

101.    I have discussed the use of mail covers with other experienced agents who have informed me that most frequently mail covers will yield correspondences with banking and financial institutions which would require agents to request Grand Jury subpoenas to those institutions for their records. This may assist in the financial side of the investigation, but will likely not identify suppliers, customers, co-conspirators and time and date of subsequent leads.

PEN REGISTER/TELEPHONE TOLL ANALYSIS

102.    Agents currently have a pen register installed on **Target Telephone #1**. San Diego DEA agents previously established pen registers on cellular telephones of **Linh Phuc NGUYEN** (619-980-7716) and **Chi BUI** (619-243-6478). Information obtained from the pen register is helpful in establishing a clear pattern of contacts between **Target Telephone #1, BUI, Linh Phuc NGUYEN,** named interceptees, telephones, and known and suspected controlled substance traffickers, this information is of limited use for evidentiary purposes. These records serve to confirm a contact between two telephones, but do not provide the nature or substance of the conversations. The mere fact that the named interceptees and their associates are known to communicate on the telephone does not provide sufficient evidence of a crime. Agents can only speculate as to the contents and purpose of such calls.

103.    Agents have used and will continue to use pen registers, trap and trace devices, and toll record analysis during this investigation. Pen register and toll information provide identifying information, to include call frequency regarding calls made from a particular telephone. This technique, however, will only provide agents with a list of the numbers called and will not establish the identities of the callers. Cellular telephone subscriber information obtained on telephone numbers from **Target Telephone #1's** toll records may identify a subscriber, but that

54

1    does not necessarily mean that the "subscribed to individual" is the person utilizing the

2    telephone.

3    104.    Pen registers do not record the identities or voices of the parties to the conversation,

4    cannot identify the sources or sources of the controlled substances, nor can they, standing alone,

5

6    establish proof of the conspiracy.

7    105.    A trap and trace device is simply a complement to a pen register - it identifies the number

8    of the telephone that has called the subject phone - and is subject to the same limitations. Trap

9    and trace devices, like pen registers, do not identify the speakers or contents of a telephone

10   conversation. For all the reasons stated above, pen registers, trap and trace devices, and toll

11   analysis are all valuable investigative tools, but even if used in conjunction with other

12

13   conventional investigative methods, will not enable the government to achieve the goals of this

14   investigation. Without the interception of wire communications, the full scope and activities of

15   the organization cannot be discovered.

16

17   106.    Based on my training and experience, as well as the training and experience of law

18   enforcement agents with whom I have spoken, I believe that pen registers will not meet all the

19   goals of this investigation discussed above.

20                              USE OF GRAND JURY SUBPOENA

21   107.    Grand Jury subpoenas have been issued by San Diego DEA agents to the financial

22

23   institutions used by **Target Subject, Chi BUI.** Grand Jury subpoenas were issued to Bank of

24   America and Washington Mutual, for the accounts associated with **BUI.** Other than indicating

25   insignificant withdraws and deposits, the subpoenas were not helpful. Financial institutions used

26   by **Nam Hoang NGUYEN**, subscriber of **Target Telephone #1** and **Linh Punc NGUYEN** have

27

28

55

000123

1   not yet been identified. Grand Jury subpoenas for testimony are expected to be issued, if at all,

2   after the conclusion of the intercept period and before any indictments. Based on my experience,

3   as well as the experience of other law enforcement authorities with whom I have consulted, I

4   believe that at this stage of the investigation, subpoenaing persons believed to be involved in this

5   conspiracy to appear before a federal grand jury would not be completely successful in achieving

6   the objectives of the investigation. In fact, any principals of this conspiracy, co-conspirators, or

7   other participants called to testify before a grand jury would most likely, in my experience, be

8   uncooperative and invoke their Fifth Amendment privilege against self-incrimination. At

9

10  present, it would be unwise to seek any kind of immunity for such persons, insofar as the grant of

11  immunity might foreclose prosecution of the most culpable persons and, in any event, could not

12

13  ensure that the immunized witnesses would provide the truthful testimony. Moreover, the

14  service of grand jury subpoenas upon conspirators would itself alert those conspirators - and

15  doubtless other conspirators - to the existence of this investigation, causing them to become even

16

17  more cautious in their activities, to flee to avoid further investigation or prosecution, or to

18  otherwise compromise the investigation.

19  108.    At this time, I am aware of no person(s) who could be subpoenaed before the grand jury

20  whom I would expect to provide significant and truthful evidence concerning the continuing

21

22  operation under investigation. The persons who would be knowledgeable about the crimes being

23  committed would be those involved in it, or their close family and friends. Those involved in the

24  crimes would be risking conviction and significant prison terms if they testified truthfully. Their

25  close family members or friends would have to abandon personal loyalty to the suspects, and risk

26

27  endangering themselves and their families by coming forward as a witnesses. Finally, attempts

28  to subpoena additional witnesses at this juncture could alert the subjects to the continuing

56

000124

1   investigation and cause the subjects to become more secretive than they already are, making it

2   even more difficult to attain the goals of this investigation.

3   ## SUBJECT AND WITNESS INTERVIEWS

4
5   109.    Based on my training, experience, and familiarity with this investigation, I believe that

6   additional interviews of the individual target subjects (or their known associates) would produce

7   insufficient information as to the identities of all of the persons involved in the conspiracy, the

8   sources of the narcotics and narcotics-related proceeds, the locations of drug records, and other

9   pertinent information relating to the offenses described above.    I also believe that any responses

10  to such interviews would contain a significant number of untruths, diverting the investigation

11  with false leads or otherwise frustrating the investigation.    Moreover, such interviews would have

12
13  the effect of alerting members of the conspiracy to the existence of this investigation, thereby

14  compromising the investigation and possibly resulting in the destruction of evidence or

15  concealment of documents and other evidence, as well as the possibility of harm to cooperating

16
17  sources whose identities may become known.

18  ## SEARCH WARRANTS

19  110.    Given the status of this continuing investigation, I believe that it is premature to seek any

20  search warrants.    At this time, it is unknown where the organization's 3, 4

21
22  methylenedioxymethamphetamine (MDMA) and marijuana and drug proceeds are  being stored.

23  It is possible that the 3,4 methylenedioxymethamphetamine (MDMA) and marijuana from the

24  most recent imported load has already been distributed; it is unknown when that load occurred or

25  when the next load may occur.

26  111.    Also, once a search warrant is executed, I expect that knowledge of the investigation

27  would spread rapidly among the co-conspirators, and the investigation would then be

28

57

000125

1    compromised by an increased risk of flight, hiding, or destruction of other evidence by co-

2    conspirators being alerted to law enforcement's interest in them.

3    ## PRIOR TITLE III WIRETAP INTERCEPTION ORDERS

4

5    112.    On April 25, 2006, an Application in support of an Order Authorizing the Interception of

6    Wire Communications over Telephone number 619-980-7716, was submitted to, and signed by

7    the Honorable Marilyn L. Huff , United States District Judge, Southern District of California.

8    Interception of Telephone number 619-980-7716 pursuant to this order commenced on April 25,,

9    2006 and ended on May 24, 2006.

10

11   113.    The current application seeks approval for a spin-off Title III order for Target Telephone

12   #1, 408-314-6063. While interception of phone calls pursuant to the previous Order has assisted

13   in furthering the investigation in this case, the numerous goals of the investigation as set forth in

14   Section IV of this Affidavit have not yet been achieved.  It is believed that Target Telephone #1

15   is continuing to traffic 3, 4 methylenedioxymethamphetamine (MDMA) and marijuana with the

16   assistance of Target Telephone #1.  The prior wiretap interception  issued in this case did not

17

18   result in the identification of any member of the 3, 4 methylenedioxymethamphetamine

19   (MDMA) and marijuana trafficking organization who is at higher level then Target Telephone

20   #1.   Interception of wire communications to and from Target Telephone #1 is therefore

21   necessary to identify members of the organization who are at the same level or higher than Target

22   Telephone #1.  The ongoing and unsatisfied goals of this investigation include identification of

23

24   all members of the organization of Target Telephone #1, its major buyers, and sources of supply;

25   its methods of drug distribution; its means of distributing and concealing proceeds and assets;

26   and developing prosecutable cases against each member of the organization affiliated with Target

27   Telephone #1.

28

000126

CONCLUSION

114.    The facts contained in this affidavit show that there is probable cause to believe that the

individuals named herein are using Target Telephone # 1 to facilitate the offenses discussed in

this affidavit, and that communications concerning those offenses will be obtained through

electronic surveillance, authorization for which is requested herein.  Normal investigative

techniques have been tried and have failed, are reasonably unlikely to succeed if tried, or are too

dangerous.  Accordingly, permission is hereby requested to intercept wire communications to and

from Target Telephone # 1.

PRIOR APPLICATIONS

115.    Inquiries of the Electronic Surveillance Indices of Drug Enforcement Administration,

Immigration and Customs Enforcement, and the Federal Bureau of Investigation on or about June

14, 2006,  revealed no prior applications for the interception of wire, oral or electronic

communications involving Target Telephone, or for any of the Target Subjects, including the

Named Interceptees except as outlined below:

     a.    On April 25, 2006, an Application in support of an Order Authorizing the

             Interception of Wire Communications over Telephone number 619-980-7716,

             was submitted to, and signed by the Honorable Marilyn L. Huff, United States

             District Judge, Southern District of California.  Interception of Telephone

             number 619-980-7716 pursuant to this order commenced on April 25, 2006 and

             ended on May 24, 2006.  Chi Thien BUI, Hai Viet TRINH, Ti Van HUYNH,

             Nina LUU, Nhan TRUONG, Ty TRUONG, Stephanie NIEMANN, Annie Yen

             BUI, Linh Phuc NGUYEN, David BAILEY, Hogan HO, Kenny NGUYEN, Tan

000127

1    Luat LE, Nam NGUYEN, Hau Cong HA, Long NGUYEN, Sandy VO and Ba

2    TAM were intercepted pursuant to this order.

3         b.    On November 28, 2005, United States District Judge Marilyn L. Huff, Southern

4               District of California, signed court order No. 05mc0745 authorizing the

5               interception of wire and electronic communications over cellular telephone

6               number (619)243-6478.  Target Subjects Chi Thien BUI, Hai Viet TRINH, aka

7               "Johnny," Ti Van HUYNH, Nina LUU, and Nhan TRUONG, aka "NT," all

8               named herein, were named as Target Subjects in this Order.[3]

9

10

11        c.    On January 10, 2006, United States District Judge Marilyn L. Huff, Southern

12              District of California, signed court order No. 05mc0745 authorizing the

13              continued interception of wire communications over cellular telephone number

14              (619)243-6478.  Target Subjects Chi Thien BUI, Hai Viet TRINH, aka "Johnny,"

15              Ti Van HUYNH, Nina LUU, Nhan TRUONG, aka "NT", Ty TRUONG,

16              Stephanie NIEMANN, Annie Yen BUI, Son LNU (a Vietnamese male),  Nick

17              LNU (a Vietnamese male), and Coster LNU all named herein, were named as

18              Target Subjects in this Order.

19

20        d.    On February 10, 2006, United States District Judge Marilyn L. Huff, Southern

21              District of California, signed court order No. 05mc0745 authorizing the

22              continued interception of wire communications over cellular telephone number

23              (619)243-6478.  Target Subjects Chi Thien BUI, Hai Viet TRINH, aka "Johnny,"

24

25    ─────────────────────

26        [3]    Although the Court crossed out the names of Ti Van HUYNH, Nina LUU, and
      Nhan TRUONG, on its initial Order authorizing the interception of wire and electronic
27    communications due to its finding that there was insufficient probable cause as to these
      individuals, the court nonetheless authorized the interception of communications involving these
28    individuals should their conversations involve the above-described criminal activity.

60

000128

Ti Van HUYNH, Nina LUU, Nhan TRUONG, aka "NT", Ty TRUONG, Stephanie NIEMANN, Annie Yen BUI, Linh PHUC NGUYEN, Tung LNU, Son LNU, Nick LNU, Coster LNU, Hiep LNU, Tuan LNU, and David C. BAILEY, aka Dung LNU, all named herein, were named as Target Subjects in this Order. Continued interception of 619-243-6478 ceased on February 27, 2006, when agents learned service provider T-Mobile shut the telephone service off for 619-243-6478 because Chi BUI had a delinquent account. BUI subsequently acquired 619-335-7037 on March 3, 2006.

e.    On March 3, 2006, United States District Judge Vanessa Gilmore, Southern District of Texas, signed a court order No. 06-088 authorizing interception of wire communications over cellular telephone number (832)755-1277. Target Subject David Charles BAILEY, named herein, was named as a Target Subject in this order. Wire intercepts pursuant to this order are no longer ongoing.

On March 23, 2006, United States District Judge Marilyn L. Huff, Southern District of California, signed court order No. 05mc0745 authorizing the initial interception of wire communications over cellular telephone number (619)335-7037 and cellular telephone number (619)245-5552. Target Subjects Chi Thien BUI, Hai Viet TRINH, aka "Johnny," Ti Van HUYNH, Nina LUU, Nhan TRUONG, aka "NT", Ty TRUONG, David C. BAILEY, aka Dung, Linh NGUYEN, Tung LNU, Annie Yen BUI, Son LNU (a Vietnamese male), Nick LNU (a Vietnamese male), and Coster LNU all named herein, were named as Target Subjects in this Order.

61

g.  Tuan LNU is believed to have been intercepted in a Title III intercept signed by United States District Court Judge Christina A. Snyder, Central District of California, on August 11, 2005.

h.  Tuan LNU is believed to have been intercepted in a Title III intercept signed by United States District Court Judge Christina A. Snyder, Central District of California, on October 20, 2005.

116.  Based upon my personal knowledge and the electronic indices searches, I am not aware of any other applications that have been made to a federal court for authorization to intercept wire, oral, or electronic communications involving any of the possible interceptees, the facilities, or the places specified in this Application.

LENGTH OF INTERCEPTION

117.  The Application for which this supporting Affidavit is submitted seeks authorization to intercept wire communications for a thirty (30) day period concerning offenses involving violations of Title 21 U.S.C. Sections 841(a)(1), 843(b), 846, 952, and 963, and Title 18 U.S.C. Sections 1956 and 1957, which have been and are being committed by speaker of Target Telephone #1, Linh Phuc NGUYEN, Chi Thien BUI and others not yet identified.

118  I believe based on my training and experience that these persons have used, are using, and will continue to use Target Telephone #1 to further illegal narcotics trafficking as long as they feel secure. Because of the continuing nature of the above-described offenses and in order to determine the full scope of the organization under investigation and identify places where controlled substances are stored and distributed, I request that the interception of wire

000130

communications not cease when the type of communications described above are first

intercepted, but continue until the objectives of this investigation are accomplished, or for a

period of thirty (30) days, whichever is earlier, with the thirty (30) day period commencing on

the day on which investigative or law enforcement officers first begin to conduct the

interception, or ten (10) days from the date the order is signed, whichever is earlier.

## MINIMIZATION EFFORTS AND PROCEDURES

119.    The requirements regarding the minimization of interception will be strictly followed.

Before interception begins, a memorandum regarding minimization and a copy of the Court's

Order authorizing interception will be provided to all monitoring agents.  In addition, a copy of

the Order and minimization memorandum will be posed at the listening site.  Before an agent

begins to intercept communications, he or she will sign a form indicating that he or she has read

the Affidavit, the Court's Order authorizing interceptions, and the minimization memorandum;

is familiar with the contents of the Order; has attended a minimization meeting; and will

intercept communications in compliance with the Court's Order.

120.    All wire communications will be minimized in accordance with Chapter 119 of Title 18

of the United States Code.  Interception will be suspended immediately when it is determined

through voice identification, physical surveillance, or otherwise, that none of the Target

Subjects or any of their criminal associates, once identified, is participating in a conversation,

unless it is determined during the portion of the conversation already overheard that the

63

conversation is criminal in nature. Even if one of the Target Subjects or their criminal associates, once identified, is a participant in a conversation, monitoring will be suspended if the conversation is not criminal in nature or not otherwise related to the offense under investigation. Based on information provided by other monitoring and supervising agents, I believe that many narcotics related conversations may occur in the course of the otherwise innocent conversations. Once interception has begun, monitoring agents will use information obtained from previous interceptions to help determine whether a particular call should be minimized as a non-pertinent call. Lengthy conversations that appear to be non-pertinent periodically will be monitored to determine if the conversation has become criminal in nature. All intercepted wire conversations will be recorded and all recordings will be securely preserved. Logs will be prepared regarding the date and time of calls, the parties involved, the subject matter of the calls, and if and when minimization occurred. Reports detailing the course of the interception will be filed with the Court on or about the tenth and twentieth by that attorney if the conversation pertains to the represented party's culpability in relation to an indictment or charges against him or her or strategy which he or she contemplates employing in defense of such charges.

It is anticipated that almost all of the conversations to be intercepted will be in Vietnamese. I expect to use Vietnamese-speaking DEA Special Agents and Task Force Agents, law enforcement officers, and contract personnel, acting under the supervision of investigative or law enforcement officers who are authorized to conduct the interception. Because it is

64

anticipated that most of the wire communications to be intercepted will be in the Vietnamese

language, it is expected that an expert in the Vietnamese language will be available for

translation whenever possible.  Pursuant to 18 United States Code § 2518(5), the following

minimization procedures have been established in the event that conversations in a code or other

foreign language are intercepted:

(a)     If foreign language translators are not reasonably available to minimize wire
        communications at the time of interception, all such wire communications will be
        intercepted and recorded in their entirety;

(b)     In the event the translator is not a federal agent, the translator, whether he or she is a
        language-trained support employee or under contract to the government, will be under
        the supervision of a federal agent or other law enforcement officer; and

© )     Wire communications monitored by the translator under the guidance of a federal agent
        or other law enforcement officer will be minimized by the translator and an English
        translation of the pertinent criminal conversations will be furnished to the supervising
        federal agent or other law enforcement officer.

121.    I believe that this procedure, which provides for after-the-fact minimization of foreign

languages used by the named interceptees when there is no expert reasonably available to

translate the conversation, complies with 18 U.S.C. § 2518(5) and its provisions for specialized

minimization procedures when intercepting communications conducted in a foreign language.

days following the commencement of interception pursuant to the Court's order.  Particular

emphasis will be placed on reporting minimization efforts to the court.

122.    Monitoring agents will be advised to follow normal minimization procedures with

65

000133

respect to any intercepted communications involving an attorney. Monitoring agents will be advised that a privilege attaches to communications between an attorney and an individual concerning a matter in connection with which the attorney represents that individual. They will be instructed to suspend monitoring of a conversation as soon as they learn that it concerns such a matter, so long as there is no reason to believe that the purpose of the conversation is to further crime or fraud.

123.    To the best of my knowledge, none of the named Target Subjects faces any pending state or federal criminal charges except as previously indicated in this Affidavit. However, all monitoring agents will be instructed to minimize all conversations involving an attorney and a party represented.

SEALING REQUESTS

124.    Because of the ongoing nature of this investigation, your affiant is requesting that this affidavit, be ordered under seal until further order of this Court, as disclosure of this affidavit would hamper further investigation efforts.

EXPENSES

125.    Any reasonable expenses necessarily incurred pursuant to a court order under Title 18, United States Code, Section 2518(4)(e) relating to the technical assistance rendered assistance to the government by a communication service provider or other persons, will be processed by the Drug Enforcement Administration for payment by the United States Government, unless the Court should direct otherwise.

// //
// //
// //
// //
// //
// //
// //

66

1    I declare under penalty of perjury that the above is true and correct to the best of my knowledge
2    and belief.
3
4    DATED: _09/05/06_
5
6
7
8    SAMMY A. PARKS
     SPECIAL AGENT, DEA
9
10
11   JEREMY FOGEL
12   UNITED STATES DISTRICT JUDGE
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                                    67

000135